**GENERAL AUTHORITY FOR SUPPLY COMMODITIES, CAIRO, EGYPT,**
Plaintiff,

v.

**INSURANCE COMPANY OF NORTH AMERICA, Defendant.**

**No. 89 Civ. 6046 (DNE).**

United States District Court,
S.D. New York.

Jan. 6, 1997.

Poles, Tublin, Patestides & Stratakis, New York City (Michael O. Hardison, of counsel), for plaintiff.

Winston & Strawn, New York City (Robert S. Fischler, Anthony D'Auria, and David Florendo, of counsel), for defendant.

## OPINION & ORDER

EDELSTEIN, District Judge:

Currently before the Court are plaintiff's and defendant's cross-motions for summary judgment, pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"). For the foregoing reasons, plaintiff's motion is denied in its entirety, and defendant's motion is granted.

## BACKGROUND

The instant motions arise from a contract dispute between plaintiff and defendant. Plaintiff General Auth. for Supply Commodities, Cairo, Egypt ("GASC") is an entity of the Egyptian government located in Cairo, Egypt. (Complaint, *General Auth. for Supply Commodities, Cairo, Egypt v. Insurance Co. of North America*, 89 Civ. 6046 ("Complaint") ¶ 2 (Sept. 12, 1989).) Defendant Insurance Company of North America, Inc. ("INA") is a Pennsylvania corporation, licensed to do business in the state of New York. *Id.* ¶ 3; (Answer, *General Auth. for Supply Commodities, Cairo, Egypt v. Insurance Co. of North America*, 89 Civ. 6046, ¶ 3 (Oct. 10, 1989).)

On or about November 20, 1979, GASC entered into a contract ("the Contract") with American Export Group, Inc. ("AEG"), under which AEG agreed to design, supply, install, and test for GASC thirty-nine automatic and semi-automatic bakery lines for the production of bread in Egypt. *Id.* ¶ 4; (Memorandum in Support of Plaintiff's Motion for Summary Judgment, *General Auth. for Supply Commodities, Cairo, Egypt v. Insurance Co. of North America*, 89 Civ. 6046 ("Pltf.'s Memo") at 3 (Oct. 20, 1992)); (Defendant's Rule 3(g) Statement, *General Auth. for Supply Commodities, Cairo, Egypt v. Insurance Co. of North America*, 89 Civ. 6046 ("Def.'s 3(g) Stmt.") ¶ 1 (Feb. 10, 1993).) The Contract was funded by a grant from the United States Agency for International Development

("AID"), an entity financed and operated under the auspices of the United States Department of State. (Dft.'s 3(g) Stmt. ¶ 1); (Reply Memorandum in Further Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendant's Cross–Motion for Summary Judgment, *General Auth. for Supply Commodities, Cairo, Egypt v. Insurance Co. of North America*, 89 Civ. 6046 ("Pltf.'s Reply") at 1 (Nov. 5, 1993).)

Pursuant to both AID's regulations and its customary practices, AEG was required to furnish a performance bond to GASC. (Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross–Motion for Summary Judgment, *General Auth. for Supply Commodities, Cairo, Egypt v. Insurance Co. of North America*, 89 Civ. 6046 ("Deft.'s Memo") at 4 (Feb. 10, 1993)); *see* (Complaint ¶ 5.) Accordingly, Article 9 of the Contract calls for a "Performance Guarantee Deposit." Paragraph 9.1 of the Contract states:

> The Contractor shall submit to GASC a one (1) year with automatic renewal clause performance guarantee, for each category, in the form of a certified check, irrevocable letter of credit, bank bond, bank guarantee, or surety bond acceptable to GASC and A.I.D. in the total amount of US $ 1,812,620 which is ten percent of the total contractual price fully protecting GASC against loss incurred by GASC as a result of Contractor failure to perform any obligations under this Contract. This performance guarantee will be held by GASC on the conditions and subject to the stipulations herein contained, as a final guarantee for the due execution and proper performance of the Contract and the recovery of any penalties or their sums for which the Contractor may become liable to GASC under the Contract. It shall be valid until the fulfillment by the Contractor of all his obligations and guarantees under the Contract. The GASC may, at any time on giving prior notice to the Contractor, deduct from the amount of the said performance guarantee any sums for which the Contractor may become liable to the GASC under this Contract and which are not paid by him within thirty (30) days of receipt of written claims stating all evidence. If the

Contractor has not so paid, the GASC shall be entitled on his first demand to the immediate payment by the Bank or surety up to the full amount of the performance guarantee, not withstanding any contestation by the Contractor or any third party.

(Arab Republic of Egypt, General Authority for Supply Commodities, Contract GASC/90–78/ARE ("GASC Contract") Art. 9.1 (Nov. 20, 1979).)

On February 26, 1980, defendant INA issued two surety bonds ("the Bonds") on AEG's behalf in favor or GASC in the amount of $1,812,620.00. (Def.'s 3(g) Stmt. ¶ 3); (Complaint ¶ 7.) The texts of the two bonds are identical, each stating that

> the Principal [AEG] and Surety(ies) [INA] hereto, are firmly bound to the General Authority for Supply Commodities (hereinafter called GASC) in the above penal sum for the payment of which we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally: *Provided*, That, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing joint action or actions against any or all of us, and for all other purposes each Surety binds itself, jointly and severally with the Principal, for the payment of such sum only as is set forth opposite the name of such Surety, but if no limit of liability is indicated, the limit of liability shall be the full amount of the penal sum.

> THE CONDITION OF THIS OBLIGATION IS SUCH, that whereas the Principal [AEG] entered into the contract identified above;

> NOW, THEREFORE, if the Principal shall:

> (a) Perform and fulfill all the undertakings, covenants, terms, conditions, and agreements of said contract during the original term of said contract and any extensions thereof that may be granted by the GASC with or without notice to the Surety(ies), and during the life of any guaranty required under the contract, and shall also perform and fulfill all the under-

takings, covenants, terms, conditions, and agreements of any and all duly authorized modifications of said contract that may hereafter be made, notice of which modifications to the Surety(ies) being hereby waived; and

(b) Pay to the GASC the full amount of the taxes imposed by the Government which are collected, deducted, or withheld from wages paid by the Principal in carrying out the construction contract or the furnishing of supplies or services with respect to which this bond is furnished; then the above obligation shall be void and of no effect.

(Performance Bond between Principal American Export Group and Surety Insurance Company of North America, 67 HF 4552 (Feb. 26, 1980)); (Performance Bond between Principal American Export Group and Surety Insurance Company of North America, 67 HF 4553 (Feb. 26, 1980).)

Shortly after INA issued the Bonds, AEG submitted the Bonds to plaintiff and to AID for their approval. (Def.'s 3(g) Stmt. ¶ 4.) By letter dated January 5, 1981, L. Fred Bruney, an INA Representative Agent, stated to Nelson Joyner of AEG that "the bonds, in [INA's] opinion, complies [sic] with Article 9 of the contract." (Letter from L. Fred Bruney, INA Representative Agent, to Nelson Joyner of AEG ("January 1981 Letter") (Jan. 5, 1981)); (Plaintiff's Memo at 4.) AID subsequently approved the Bonds. (Deft.'s 3(g) Stmt. ¶ 4.)

Plaintiff, however, was "concerned about the security afforded by these documents in the case of a failure by AEG to perform any of its obligations under the Contract." (Pltf.'s Reply at 1.) Defendant explains, and plaintiff does not dispute, "that the performance bonds issued by INA, by their express, unambiguous terms, are conditional— i.e., that they obligate INA to pay damages only if AEG defaults in its obligation to perform the underlying contract." (Dft.'s Memo at 2.) Plaintiff objected to the conditional nature of the Bonds, "and requested that so-called 'on first demand' or 'forfeiture bonds' be issued," which would "require [defendant] to make payment upon demand, even in the absence of any breach by its

principal [AEG]." (Deft.'s 3(g) Stmt. ¶ 4); see (Pltf.'s Reply at 1.) Defendant states that "AEG advised plaintiff that it would not furnish forfeiture bonds and AID advised plaintiff that the conditional INA bonds satisfied paragraph 9.1 of the Contract and AID's regulations." (Deft.'s 3(g) Stmt. ¶ 5.) Plaintiff concurs that AID confirmed that the Bonds "fully complied" with the provisions of Article 9 of the Contract, and that AID advised GASC in writing that the Bonds "were acceptable in AID-financed transactions." (Pltf.'s Reply at 2–3.)

According to plaintiff, plaintiff "continued to express concern about the security afforded by the [Bonds]. . . ." (Pltf.'s Reply at 3–4.) Plaintiff thus sought further assurances from both AID and AEG regarding the protection afforded by the Bonds. Id. at 2–4. In response, both AID and AEG continued to advise plaintiff that each was aware of the text of the Bonds, and that each believed the Bonds complied with the requirements of Article 9 of the Contract. Id. at 2–6. Moreover, in a letter from AID to GASC, AID notified plaintiff that in AID's opinion, INA's January 5, 1981 letter "represents the surety's intention to accept the proof requirements as set forth in Article 9 of the Contract ... [which] [i]n effect, removes the conditionality of the bonds, at least in the first instance." Id. at 6 (quoting letter from L. Michael Hager, Legal Advisor to the United States Agency for International Development, to Mohammed El–Saadany, Esq., Legal Advisor and Project Manager of General Authority for Supply Commodities ("Hager Letter") at 1) (Jan. 19, 1981). Given these assurances, GASC accepted the bonds as the performance guarantee required by the Contract, and advised AID of this decision. Id. at 7. In addition, defendant states, and plaintiff does not dispute, that "at no time did AEG attempt to obtain forfeiture bonds and none were issued." (Deft.'s 3(g) Stmt. ¶ 5.)

The parties present this Court different versions of the remaining facts underlying the instant dispute. Plaintiff asserts the following:

9. AEG failed to perform its obligations under the Contract despite repeated assurances and efforts over the course of sever-

al years and GASC, as a result, demanded that AEG pay GASC, as damages and penalties, the total amount of $3,600,000.00, but, despite such demand, AEG did not pay GASC.

10. GASC further demanded that INA pay GASC, as damages and penalties, the total amount of $1,812,620.00 guaranteed to GASC by the Performance Bonds but, despite demand, INA did not pay GASC.

11. GASC has duly performed all obligations on its part to be performed.

12. GASC, by reason of the premises, has been damaged by INA in the amount of $1,812,620.00, no part of which has been paid, although due and duly demanded.

(Complaint ¶¶ 9–12.) In support of its assertions, plaintiff submits an engineering report detailing the deficiencies in AEG's work, and estimating that these deficiencies will cost plaintiff $1,860,000.00 to repair. (Pltf.'s Reply at 11–12); (Report on the Automatic Bread Lines Delivered by the American Export Group (AEG) to The General Auth. for Supply Commodities, ("GASC Report") (1985).) The GASC Report further estimates that plaintiff has suffered loss as a result of AEG's faulty performance in the amount of 8,537,745.00 Egyptian Pounds, plus $2,264,763.00 United States Dollars. (Pltf.'s Reply at 12); (GASC Report at 42.)

Plaintiff explains that on June 26, 1985, it forwarded to AEG letter that "highlighted the operational, installation and design defects . . . found in the bakery lines by the technical experts." (Pltf.'s Memo at 5.) In this letter, plaintiff "demanded that AEG immediately pay GASC the sum of $3,600,000.00 as damages and penalties." *Id.* Plaintiff asserts that GASC did not heed this demand. *Id.* On July 28, 1985, GASC forwarded a letter to INA informing INA that GASC "had given AEG the notification required by Article 9 of the Contract concerning AEG's failure to perform its contractual obligations," advising INA that AEG had failed to pay GASC the $3,600,000.00 demanded by GASC, and "demand[ing] that INA confiscate the value of the Performance Bonds . . . for the benefit of GASC." *Id.* at 5–6. Plaintiff reports that INA did not pay the demanded sum to GASC. *Id.* at 6.

Defendant, on the other hand, denies any breach of the Contract. It claims that

AEG completed performance of the Contract in 1984, by which time it had received total payments from AID in excess of $20 million. Virtually all payments to AEG were certified by plaintiff in accordance with the Contract.

(Deft.'s 3(g) Stmt. ¶ 6.) In support of this assertion, defendant submits the affidavit of Nelson T. Joyner, the Vice President of Planning and Administration for AEG during the time period relevant to the instant dispute. (Affidavit of Nelson T. Joyner, *General Auth. for Supply Commodities v. Insurance Co. of North America*, 89 Civ. 6046 ("Joyner Aff.") ¶ 1 (Feb. 8, 1993).) Joyner states that

AEG procured and shipped to Egypt all of the equipment called for by the Contract and supervised the installation of equipment by GASC personnel (to the extent [AEG] received cooperation in that endeavor from GASC,) and AEG received from AID periodic progress payments (approved by GASC), as contemplated by the contract. By mid 1984 or so, AEG has received total payments under the Contract in excess of $20 million.

*Id.* ¶ 11.

Plaintiff contends that "AEG never fulfilled its contractual duties or compensated GASC for its failure to do so," and that "INA never fulfilled its obligations or compensated GASC for its failure to do so." (Pltf.'s Memo at 7.) Plaintiff further states that AEG filed for bankruptcy on April 30, 1987, in Washington, D.C. *Id.* at 8. Although GASC has filed a claim for its damages in AEG's bankruptcy proceeding, to date it has recovered nothing. *Id.*

## DISCUSSION

Pursuant to Rule 56, plaintiff moves this Court for summary judgment on the subject matter of its complaint. Plaintiff asserts that the material facts underlying the instant motion are undisputed, and advances three arguments in support of its legal position. First, plaintiff claims that "the contract and the performance bonds should be read together in order to determine the obligations

of INA." (Pltf.'s Memo at 9.) Plaintiff explains that surety contracts, such as the performance bonds at issue in the case at bar, "are subject to the same rules of construction as other contracts." *Id.* According to plaintiff "it is well established that a bond and the contract which it was written to guarantee should be read together when the bond makes appropriate reference to the contract." *Id.* Thus, plaintiff concludes that "a surety's obligation should be construed by reading together all instruments, statutes and regulations underlying the transaction." *Id.*

In the case at bar, plaintiff states that there is no question that the relevant contract is the Contract between AEG and GASC, dated November 20, 1979. *Id.* Plaintiff asserts that "the Performance Bonds make appropriate reference to the Contract" by specifically identifying its number, date of entry, and principal. *Id.* at 10. Accordingly, plaintiff asserts that "[t]he Contract and the Performance Bonds should be read together in order to determine the obligations of INA to GASC." *Id.*

Second, plaintiff argues that summary judgment is appropriate in this case because the "sole issue" before this Court "is the determination of the obligation of INA to GASC." *Id.* at 14. Plaintiff states that the Bonds "set forth that they will remain in effect until AEG fully performs all its obligations under the Contract. The [Bonds] do not set forth what event will trigger the obligation of INA to pay the face amount of each bond to GASC. Nevertheless, this question is easily answered by reference to the Contract." *Id.* at 11.

Plaintiff refers this Court to Article 9 of the Contract and explains that Article 9 provides that "[u]pon a written claim to AEG, and non-payment of same within thirty (30) days, GASC is entitled, on its first demand, to immediate payment from INA up to the full amount of the Performance Bonds." *Id.* at 12. Plaintiff goes on to state that such provisions are "not at all unusual in large international construction projects (such as the Automatic Bakeries Project between AEG and GASC)." *Id.* In support of this

assertion, Plaintiff provides this Court the following two excerpts from legal treatises:

> Unconditional guarantees are obviously advantageous to owners and, during the last two decades, *owners involved in large construction projects abroad have succeeded in moving from conditional bonds and guarantees to unconditional guarantees payable on first demand.*

> Such [unconditional] bonds are commonly used abroad, *especially in the Middle East, where the guarantor is required to pay the buyer on first demand without any need by the latter to prove any default by the seller.*

*Id.* at 13 (quoting *Performance Bonds and Guarantees: Current Issues, Use of Letters of Credit and Particular International Problems, in* the Construction Industry, in International and Domestic Guarantees and Other Collateral Assurances of Performance 449 (Practicing Law Inst. Comm. L. & Prac. Course Handbook Series No. 501 (1989) (emphasis supplied by plaintiff)) and D. Marks & G. Moss, *Rowlett on the Law of Principal and Surety* 234 n. 4 (4th ed. 1982) (emphasis and parenthetical supplied by plaintiff)).

Based on these authorities, plaintiff maintains that the Bonds issued by INA are unconditional bonds, and that plaintiff is entitled to payment of the Bonds because it has made both a written claim upon AEG and a written demand upon INA. *Id.* Accordingly, plaintiff seeks an entry of summary judgement in its favor on this question of law. *Id.* at 14.

Third, plaintiff requests prejudgment interest. Plaintiff states that although "[t]he liability of a surety is usually limited to the face amount of the issued bond," a court may award prejudgment interest to an aggrieved party "if the surety delays payment beyond proper notification of liability...." *Id.* at 15. According to plaintiff's reading of various decisions from the Supreme Court and various Courts of Appeal, "[a]n award of prejudgment interest ensures the complete compensation of the aggrieved party." *Id.* at 15–16. In addition, plaintiff asserts that both Section 7–301 of the New York General Obligations Law, and Section 5004 of the New

York Civil Practice Law and Rules authorize an award of prejudgment interest. *Id.* at 16.

Plaintiff reiterates that it "demanded that INA confiscate the value of the Performance Bonds ... on behalf of GASC," and that INA did not do so. *Id.* Because plaintiff is the aggrieved party, it "should be completely compensated" by defendant. *Id.* Plaintiff argues that "[t]he only way to completely compensate GASC is to award prejudgment interest.... at 9% per annum on the sum of $1,812,620.00 from August 28, 1985 until the date of judgment." *Id.*

In response, defendant INA opposes plaintiff's motion for summary judgment, and, pursuant to Rule 56, cross-moves for summary judgment. INA states that "the sole issue before the Court on this motion and cross-motion is whether the two performance Bonds issued by defendant INA, which on their face are conceded to be conditional bonds requiring payment only upon the default of AEG, should, as a result of paragraph 9.1 of the underlying contract, be construed as "forfeiture" bonds entitling GASC to the immediate payment of $1.8 million." (Defendant's Memo at 3.)

According to INA, the Bonds should not be construed as forfeiture bonds, and therefore, the Bonds do not entitle GASC to any immediate payment. INA proffers four arguments in support of this position.

First, INA claims that the terms of its Bonds, not the text of the Contract, control the determination of INA's liability to GASC. *Id.* at 9. According to INA, "[i]nterpretation of a contract of suretyship is governed by the same standards that govern the interpretation of contracts in general." *Id.* Specifically, "[w]here the intention of the parties may be gathered from the four corners of the surety's bond, interpretation of the bond is a matter of law and parole evidence is not admissible as an aid in interpretation." *Id.* Moreover "where the express, unambiguous terms of a surety bond conflict with the terms of the bonded contract, the extent of the surety's liability is controlled by its bond." *Id.* at 10.

Based on these principles, defendant asserts that plaintiff's argument is "back-wards"—that in the case of conflict between terms of a surety bond and the term of the bonded contract, it is the bond that controls the extent of the surety's liability, not the bonded contract. *Id.* at 12. Defendant further asserts that plaintiff's claims to the contrary ignore the voluminous and well-settled authorities that support defendant's position. *Id.* at 12–13. Thus, defendant INA maintains that the Bonds in the instant case are unambiguously conditional, that their terms alone control the determination of INA's liability to GASC, and that under these terms, INA is not obligated to pay GASC. *Id.* at 14–15.

In addition, defendant characterizes plaintiff's reliance upon the January 1981 letter as "misplaced." *Id.* at 15. INA explains that this letter "was written at AEG's request," and that "INA was not involved in any of the discussions between AEG and plaintiff with respect to the type of bonds that AEG would procure." *Id.* According to INA, the January 1981 letter "merely affirms INA's view that its bonds complied with paragraph 9.1 of the contract and cannot be deemed to have converted the bonds from conditional bonds to forfeiture bonds." *Id.* Additionally, INA states that "the letter was not intended (and does not purport) to convert INA's bonds to forfeiture bonds, and it was INA's intent and understanding throughout that it had issued standard performance bonds and that its liability would be governed by the express terms of the bonds it issued." *Id.* INA claims that this intent "is evidenced by, among other things, the fact that INA was paid the (lower) premium rate applicable to conditional bonds and that AEG did not fully collateralize the bonds, as would have been required if INA had issued forfeiture bonds." *Id.* at 15 n. 6.

Second, defendant argues that "plaintiff misconstrues paragraph 9.1 of the Contract, which does not require forfeiture bonds." *Id.* at 16. On the contrary, "[w]hile the language of paragraph 9.1 of the contract that plaintiff highlights in its motion papers speaks in terms of payment on demand, the first sentence of the paragraph (which is the only sentence plaintiff fails to quote) expressly states that one of the acceptable types of

performance guarantees is a *'surety bond'.'' Id.* (emphasis in original). INA concludes that the Bonds, as surety bonds, are in compliance with the Contract. *Id.*

INA continues that "the most persuasive evidence that paragraph 9.1 permitted conditional bonds such as those issued by INA is that AID, the party whose funds were at risk, believed that to be the case." *Id.* at 16–17. Defendant highlights the written assurance that AID provided GASC that the bonds "were acceptable to AID" and that "under Article 9.1 of the subject contract, a surety bond is an acceptable form in presentation as a performance guarantee." *Id.* at 17. INA submits two authorities in support of both AID's and INA's own interpretation of the bonds. According to defendant, "a 'surety bond,' by definition, is conditioned on the default of the principal." *Id.* at 16. In addition, defendant excerpts the following sentence from a chapter of the treatise *Handling Fidelity and Surety Claims* entitled "International Construction Bonds": "It is evident that a bond containing an on first demand or similar provision is not a surety bond at all, but an unconditional undertaking by the so-called surety to pay without regard to whether there has been a default by the bonded contractor." *Id.* at 17 (quoting *Handling Fidelity and Surety Claims* 213 (1984)).

Third, INA insists that "plaintiff has waived the right to insist on compliance with paragraph 9.1 of the contract, to the extent that paragraph may be deemed to require forfeiture bonds." *Id.* at 18. INA states that "[a] waiver is an intentional abandonment or relinquishment of a known right or advantage which, but for the waiver, the party would have enjoyed." *Id.* at 18. Either party to a contract may waive a contractual provision made for his benefit, and may do so either expressly or impliedly "by acts and conduct manifesting an intent and purpose not to claim the alleged advantage." *Id.* According to INA, courts apply waiver principles in cases involving surety bonds. *Id.*

In the instant case, defendant claims that "it is indisputable that plaintiff understood from the outset that the bonds issued by INA were conditional, and not the forfeiture bonds plaintiff desired." *Id.* at 20. Defendant asserts that plaintiff was free to reject INA's bonds and to refuse to go forward with the Contract when plaintiff's attempts to obtain forfeiture bonds proved unsuccessful. *Id.* Nevertheless, plaintiff "chose to accept full performance of the contract by AEG (and to certify AID payments to AEG in excess of $20 million)." *Id.* INA thus contends that "even assuming arguendo that plaintiff's interpretation of paragraph 9.1 is correct, ... by accepting performance, plaintiff waived the right to insist on forfeiture bonds." *Id.*

Finally, defendant rejects plaintiff's claim that AEG failed to perform the Contract. *Id.* at 21. INA points out that plaintiff's sole support for this claim is "a report, purportedly prepared by a committee of so-called 'experts' appointed by the Egyptian court." *Id.* INA declares that both this report and plaintiff's other assertions regarding AEG's alleged performance defects "are completely irrelevant to the only issue on this motion, which is whether the INA bonds should be construed as forfeiture bonds." *Id.* Defendant suggests that if GASC wishes to litigate the issue whether AEG breached the Contract, that the parties do so, for "the bonds require that that issue be resolved in plaintiff's favor before any liability attaches under the bonds." *Id.* Such resolution, however, is only appropriate after pre-trial discovery has been completed because "plaintiff's gratuitous inclusion of the ex-parte, hearsay report of its so-called 'experts' is nothing more than a transparent attempt to prejudice this Court with respect to the limited issue now before it." *Id.*

Plaintiff responds to defendant's cross-motion with three additional arguments. First, GASC insists that the January 1981 letter "demonstrates an unequivocal undertaking by INA to comply with the unconditional payment on first demand provision of Article 9 of the Contract between GASC and AEG." (Pltf.'s Reply at 14.) Plaintiff states that under New York law, the rights of parties to a facially unambiguous contract are determined solely by the terms of the contract itself rather than by reference to extrinsic evidence. *Id.* Plaintiff thus main-

tains that "this Court should construe the terms expressed in the instrument itself (the INA letter dated January 5, 1981) and ignore INA's proffer of extrinsic evidence meant to demonstrate INA's unexpressed intent." *Id.* According to plaintiff, INA's statement in the January 1981 Letter that "the bonds in [INA's] opinion, complies [sic] with Article 9 of the contract" is an "unequivocal and unconditional" representation that "INA yielded to GASC and agreed to accept the unconditional payment on first demand requirement of Article 9 of the Contract." *Id.* at 15. Because this terminology is unequivocal and unambiguous, plaintiff contends that this Court must determine the parties respective rights in this case based solely on the January 1981 Letter without reference to any extrinsic evidence of INA's intent. *Id.*

Second, plaintiff asserts that INA is equitably estopped from contending that it did not intend the Bonds to be unconditional undertakings. *Id.* at 20. Plaintiff explains that the doctrine of equitable estoppel "prevents one party from enforcing rights which would result in a fraud or injustice upon a second party who in justifiable reliance upon the former parties' words or conduct, had been mislead into acting upon the belief that such enforcement would not be sought." *Id.* at 21.

GASC submits that strict enforcement of the terms of the Bonds in the instant would be unjust. *Id.* at 21. Plaintiff claims that it specifically relied upon INA's written representations that the Bonds complied with Article 9 of the Contract, and that this reliance was justifiable. *Id.* It further maintains that its reliance was justifiable because "[t]hese representation [sic] induced GASC and AID to accept the Performance Bonds as the Performance Guarantee Deposit required to be furnished by AEG in order for the Contract to come into force," and that "GASC, absent these representations, would not have accepted the Performance Bonds as the required Performance Guarantee Deposit." *Id.* at 21–22. GASC reiterates that it was damaged as a result of AEG's alleged deficient performance of the contract and its subsequent filing for bankruptcy. *Id.* at 22.

Because "GASC has no recourse except against the Performance Bonds issued by INA," and because "[i]t would work an injustice upon GASC" to strictly enforce the terms of the bonds, GASC argues that INA should be equitably estopped from contending that it did not intend the bonds to be an unconditional undertaking. *Id.*

Third, GASC restates its claim that AEG failed to fully perform the Contract. *Id.* at 23. Plaintiff explains the various defects allegedly found in AEG's work, and claims that the Contract obligated AEG to repair and replace these defects. *Id.* Plaintiff further rejects defendant's assertion that defendant's receipt of funds demonstrates performance of AEG's contractual obligations. *Id.* at 24. Alternatively, plaintiff suggests that the evidence before this Court at minimum "raises triable issues of fact" that preclude an entry of summary judgment on this issue. *Id.*

Defendant rebuts each of the arguments presented in plaintiff's reply papers. INA first argues that "extrinsic evidence may not be considered to alter or interpret the bonds." (Deft.'s Reply at 6.) INA reiterates the legal principles that "[e]xtrinsic evidence may not be used to create an ambiguity in an otherwise unambiguous agreement," and that the "[i]nterpretation of a surety bond is governed by the same standards that govern the interpretation of contracts in general." *Id.*

According to defendant, "plaintiff does not dispute that the INA bonds, on their face, are not forfeiture bonds, but rather unambiguously conditioned on the default of INA's principal, AEG." *Id.* On the contrary, "in an effort to avoid the inevitable result which flows from application of the relevant legal principles to that fact, plaintiff ... pretends that the contract to which these principles apply if the January 5, 1981 letter authored by Mr. Bruney." *Id.* (emphasis in original). In INA's view, "[t]hat pretense is absurd, if not disingenuous, as no serious argument can be made that the contracts which the Court is being asked to interpret are anything other than the INA bonds." *Id.* at 6–7. Moreover, "[f]ar from constituting the contract which is at issue, the [January 1981] [L]etter is merely an extrinsic document, which plaintiff offers to vary, or to create an ambiguity

with respect to, the terms of the INA bonds." *Id.* at 7.

Alternatively, INA argues that if the Bonds were ambiguous, and extrinsic evidence was therefore admissible, plaintiff still would not be entitled to summary judgment. *Id.* at 9. INA states that under Second Circuit case law, "summary judgment is precluded where the agreement to be construed is fairly capable of more than one reasonable interpretation and extrinsic evidence must be evaluated to discern the parties' true intent." *Id.* Thus, defendant claims that if this Court concludes that there is some ambiguity in the Bonds which requires resort to extrinsic evidence, such as the January 1981 Letter, there are triable issues of fact regarding the extrinsic evidence that render summary judgment on plaintiff's claim inappropriate. *Id.* at 15.

INA also dismisses plaintiff's "last-gasp" equitable estoppel argument. *Id.* at 16. INA explains that "the principle of estoppel permits recovery only when a representation of fact made to a party who relies thereon with the right to so rely may not be denied by the party making the representation if such denial would result in injury or damage to the relying party." *Id.* According to INA, the representations upon which plaintiff claims to have relied to its detriment were opinions, not facts, and therefore are legally precluded from serving as the basis for relief under the doctrine of equitable estoppel. *Id.* at 17–18. Moreover, defendant claims that plaintiffs have failed to submit competent evidence either that plaintiff relied on the aforementioned representations, or that its alleged reliance was justifiable. *Id.* at 16–17. Finally, INA contends that "plaintiff's own contemporaneously created documents" belie plaintiff's reliance claims. *Id.* at 18. INA quotes a May 5, 1981, letter from GASC's Legal Consultant and Project Manager which "makes clear that it was not INA's letter on which plaintiff relied, but on AID's opinion of that letter" which states that the bonds were "accepted due to the legal opinion of AID." *Id.*

Finally, defendant insists that the issue whether AEG breached the Contract is not properly before this Court. *Id.* at 19. De-

fendant explains that "plaintiff's complaint is limited to one claim—that INA's bonds are forfeiture bonds which entitle plaintiff to payment on demand." *Id.* According to INA, "[a] court has no jurisdiction to decide, on a motion for summary judgment, claims for relief which are not asserted in the complaint." *Id.* Thus, INA maintains that this Court lacks jurisdiction to entertain plaintiff's motion for summary judgment on the issue whether AEG breached the Contract. *Id.*

Defendant finally contests plaintiff's request for prejudgment interest. *Id.* at 21. INA states that "Article 9.2 of the underlying contract provides that any advance payment under the bonds has to be returned to AEG if an arbitration panel subsequently finds that the payment was 'unjustified.'" *Id.* Thus, if this Court ordered INA to make any payment made to GASC at this time, AEG "would be entitled to seek return of the $1.8 million on ground that the payment was unjustified." *Id.* Because plaintiff's right to the funds thus depends on resolution of the issue whether AEG breached the Contract, INA argues that any award of funds at this time would be premature. *Id.* at 21–22.

As the parties concede, the sole issue pending before this Court is whether the Bonds are forfeiture bonds that entitle GASC to payment on demand from INA regardless of whether AEG breached the Contract. *See* (Deft.'s Memo at 3, 21); (Deft.'s Reply at 18); (Complaint ¶¶ 5–12); (Pltf.'s Memo at 14.) Despite the variety of theories that the parties have advanced regarding this issue, this Court notes that they all arise under the same legal principles—those of basic contract law. Accordingly, this Court will examine the law of contracts as it applies to the facts of the instant case in order to resolve the parties' cross-motions for summary judgment.

Pursuant to Rule 56, summary judgement is appropriate where "the pleadings, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment

bears the initial burden of demonstrating the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC.*, 867 F.Supp. 262, 265 (S.D.N.Y.1994), and the party may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

■ The existence of a genuine issue of material fact depends on both the genuineness and the materiality of the issues raised by the motion. *See Scottish Air*, 867 F.Supp. at 266. To evaluate a fact's materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). As the Second Circuit has noted, "all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988); *see also Celotex*, 477 U.S. at 330 n. 2, 106 S.Ct. at 2556 n. 2.

The Second Circuit's standards for considering a summary judgment motion in a contract dispute are firmly established. "[I]n a contract dispute, summary judgment may be granted only where the language of the contract is unambiguous." *Nowak v. Ironworkers Local Pension Fund*, 81 F.3d 1182, 1192 (2d Cir.1996) (citation omitted). Under New York law, whether a written contract is unambiguous is a question of law for the trial court whose determinations will be reviewed *de novo.*" *Id.* (citing *W.W.W. Assoc. Inc. v. Giancontieri*, 77 N.Y.2d 157, 163, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990)). Contract terms are ambiguous if they are

capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

*Nowak*, 81 F.3d at 1192 (citation omitted). Conversely, "no ambiguity exists when contract language has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion.'" *Sayers v. Rochester Tel. Corp. Supplemental Mgt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (quoting *Breed v. Ins. Co. of N. America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)).

Even when parties dispute the meaning of specific contract clauses, a Court's task is "to determine whether such clauses are ambiguous when 'read in the context of the entire agreement.'" *Sayers*, 7 F.3d at 1095 (quoting *W.W.W. Assocs.*, 77 N.Y.2d at 163, 565 N.Y.S.2d 440, 566 N.E.2d 639); *see also Williams Press, Inc. v. New York*, 37 N.Y.2d 434, 440, 373 N.Y.S.2d 72, 335 N.E.2d 299 (N.Y.1975). By examining the entire contract, courts "safeguard against adopting an interpretation that would render any individual provision superfluous." *Sayers*, 7 F.3d at 1095 (citing *Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465, 472 N.E.2d 315 (N.Y. 1984)); *see also Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985). However, "[p]arties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement." *Sayers*, 7 F.3d at 1095 (citations omitted).

■ "The interpretation of a contract of suretyship is governed by the standards which govern the interpretation of contracts in general." *General Phoenix Corp. v. Cabot*, 300 N.Y. 87, 92, 89 N.E.2d 238 (N.Y.1949); Restatement, Surety § 88. A surety is "[o]ne who undertakes to pay money or to do any other act in event that his principal fails therein." Blacks' Law Dictionary 1293 (5th ed. 1979). Correspondingly, a contract of suretyship is "[a] contract whereby one person engages to be answerable for the debt, default, or miscarriage of another." *Id.* The

basic standard governing the interpretation of contracts of surety long ago was set out by the New York Court of Appeals:

> No citation of authorities is needed to show that the contracts of sureties are to be construed like other contracts so as to give effect to the intention of the parties. In ascertaining that intention, we are to read the language used by the parties in light of the circumstances surrounding the execution of the instrument, and, when we have thus ascertained their meaning, we are to give it effect; but when the meaning of the language used has been thus ascertained, the responsibility of the surety is not to be extended or enlarged by implication or construction, and is *strictissimi juris*.

*People v. Backus*, 117 N.Y. 196, 201, 22 N.E. 759 (N.Y.1889); *see Davis Acoustical Corp. v. Hanover Ins. Co.*, 22 A.D.2d 843, 843, 254 N.Y.S.2d 14 (N.Y.App.Div.1964).

■ Thus, "the surety bonds attaches to the principal contract and must be construed with it." *Carrols Equities Corp. v. Villnave*, 57 A.D.2d 1044, 1045, 395 N.Y.S.2d 800 (N.Y.App.Div.1977). "[W]here no interpretation of the language is required to ascertain its meaning 'a surety's obligation is construed *strictissimi juris* in the surety's favor.'" *Mendel–Mesick–Cohen–Architects v. Peerless Ins. Co.*, 74 A.D.2d 712, 713, 426 N.Y.S.2d 124 (N.Y.App.Div.1980). Moreover, "the liability of a surety cannot be extended beyond the plain and explicit language of the contract." *Id.* at 712, 426 N.Y.S.2d 124.

■ Applying New York law to the facts of the instant dispute, this Court finds that the language of the Contract and the Bonds unambiguously establishes that INA's obligation to GASC is that of a surety, and that as a result, INA owes GASC no payment unless and until GASC establishes that AEG failed to perform on the underlying Contract. As an initial matter, this Court notes that the Bonds underwritten by INA are acceptable performance guarantees under the terms of Article 9.1 of the Contract. Throughout plaintiff's papers, plaintiff suggests to this Court that a surety bond is not an acceptable type of performance guarantee under Article 9 of the Contract. *See* (Pltf.'s Memo at 12–13); (Pltf.'s Reply at 1–4.) As defendant correctly highlights, however, Article 9 of the Contract specifically provides that "[t]he Contractor shall submit to GASC a one (1) year with automatic renewal clause performance guarantee, for each category, in the form of a certified check, irrevocable letter of credit, bank bond, or *surety bond* acceptable to GASC and A.I.D...." (Contract, Art. 9.1 (emphasis added).) The parties do not dispute that the Bonds at issue in the instant case are surety bonds. *See, e.g.,* (Pltf.'s Memo at 9–10, 15–16); (Dft.'s Memo at 3, 9–10, 12.) Thus, this Court finds that all of plaintiff's arguments premised on the idea that surety bonds were not acceptable performance guarantees for the Contract are factually unsupported and should be dismissed.

■ Moreover, the basic definition of the term "surety" undercuts plaintiff's assertions that the Bonds are forfeiture bonds that entitle plaintiff to payment from INA on demand regardless of AEG's performance. As stated earlier, the leading legal dictionary—which plaintiff itself cites in its papers to this Court, (Pltf.'s Reply at 15)—defines "contract of suretyship" as "[a] contract whereby a one person engages to be answerable for the debt, default, or miscarriage of another." Blacks' Law Dictionary 1293 (5th ed. 1979). The Bonds, as surety bonds, do not render INA liable for AEG's obligations under the Contract unless AEG fails to perform or otherwise defaults on those obligations, and thus are not forfeiture bonds that entitle GASC to payment regardless of AEG's performance under the Contract.

The texts of both Article 9 of the Contract and the Bonds themselves reflect INA's role as surety in the instant case. Throughout the text of both Bonds, INA is identified and referred to as "Surety." (Performance Bond between Principal American Export Group and Surety Insurance Company of North America, 67 HF 4552 (Feb. 26, 1980)); (Performance Bond between Principal American Export Group and Surety Insurance Company of North America, 67 HF 4553 (Feb. 26, 1980).) The text of the Bonds themselves are silent regarding the terms of INA's obligation to GASC. Under New York law, however, "the surety bond attaches to the princi-

pal contract and must be construed with it." *Villnave*, 57 A.D.2d at 1045, 395 N.Y.S.2d 800. Consequently, this Court looks to Article 9.1 of the Contract for these terms.

As previously quoted, Article 9.1 states that

> [t]he Contractor shall submit to GASC a one (1) year with automatic renewal clause performance guarantee, ... fully protecting GASC against loss incurred by GASC *as a result of Contractor's failure to perform any obligations under this Contract.* This performance guarantee will be held by GASC on the conditions and subject to the stipulations herein contained, *as a final guarantee for the due execution and proper performance of the Contract* and the recovery of any penalties or their sums for which the Contractor may become liable to GASC under the Contract. It shall be valid *until the fulfillment by the Contractor of all his obligations and guarantees under the Contract.* The GASC may, at any time on giving prior notice to the Contractor, deduct from the amount of the said performance guarantee any sums *for which the Contractor may become liable* to the GASC under this Contract and which are not paid by him within thirty (30) days of receipt of written claims stating all evidence. If the Contractor has not so paid, the GASC shall be entitled on his first demand to the immediate payment by the Bank or surety up to the full amount of the performance guarantee, not withstanding any contestation by the Contractor or any third party.

(Contract, Art. 9.1 (emphasis added).) As the emphasized portions of Article 9.1 establish, the purposes of the performance bonds are to guarantee AEG's performance under the Contract and to protect GASC against AEG's failure to perform. Moreover, Article 9.1 conditions GASC's power to collect from the performance bonds on AEG incurring liability to GASC for AEG's failure to perform, *to wit:* GASC may demand immediate payment from INA if AEG fails to pay "any sum for which [AEG] may become liable to GASC under this Contract" only "as a result of Contractor's failure to perform obligations under this Contract." *Id.*

■ It is plain from the text of the Contract that a contract of suretyship was an authorized form of performance guarantee for the GASC/AEG Contract. It is further evident from both the language used in the Bonds and the terms of the Contract that the performance guarantee required for the Contract contemplated payment by INA to GASC only in the event that AEG failed to properly perform under the Contract. As the New York Court of Appeals long ago made clear "when the meaning of the language used has been thus ascertained, the responsibility of the surety is not to be extended or enlarged by implication or construction, and is *strictissimi juris.*" *Backus*, 117 N.Y. at 201, 22 N.E. 759 (N.Y.1889); *see also Davis Acoustical*, 22 A.D.2d at 843, 254 N.Y.S.2d 14; *Mendel–Mesick–Cohen–Architects*, 74 A.D.2d at 713, 426 N.Y.S.2d 124. Because "the liability of a surety cannot be extended beyond the plain and explicit language of the contract," *Mendel–Mesick–Cohen–Architects*, 74 A.D.2d at 712, 426 N.Y.S.2d 124, this Court finds that INA's obligation to GASC is that of a surety only, and that as a result, INA owes GASC no payment unless and until GASC establishes that AEG failed to perform on the underlying Contract. Accordingly, this Court finds that GASC's claim for payment on demand is meritless, and consequently, that its motion for summary judgment should be denied.

GASC's arguments to the contrary do not require a different result. For instance, plaintiff's reliance on treatises in support of its claims is misplaced. As quoted earlier, these treatises express general, scholarly opinions about the benefits of using unconditional guarantees and forfeiture bonds for large construction contracts performed abroad, and the frequency with which such bonds and guarantees are used. *See* (Pltf.'s Memo at 13.) Moreover, neither of plaintiff's quoted excerpts from these treatises are based on, or refer to, the particular facts of the instant dispute. *See id.* Because plaintiff's cited authorities neither address the facts underlying the instant motions nor express any specific opinion about the dispute at bar, this Court finds that plaintiff's reliance upon them to support plaintiff's claims

that the Bonds are forfeiture bonds is misplaced.

Similarly misguided is plaintiff's argument regarding the January 1981 Letter. To reiterate, plaintiffs argue that because the obligations of parties to a facially unambiguous contract are determined solely by the terms of the contract itself rather than by reference to extrinsic evidence, "this Court should construe the terms expressed in the instrument itself (the INA letter dated January 5, 1981) and ignore INA's proffer of extrinsic evidence meant to demonstrate INA's unexpressed intent." *Id.* As defendant correctly states, this "pretense is absurd, if not disingenuous . . . ." *Id.* at 6–7.

■ Although it is true that extrinsic evidence is inadmissible to determine the obligations of parties to a facially unambiguous contract, there is no question that the contract at issue in this dispute is the GASC/AEG Contract signed November 20, 1979, not the January 1981 Letter. Plaintiff, through its submissions to this Court, actually highlights this fact: (1) plaintiff's Complaint refers only to the Contract, not the January 1981 Letter, *see, generally,* (Complaint); (2) plaintiff's memorandum of law specifically concedes that the relevant contract is the GASC/AEG Contract dated November 20, 1979, (Pltf.'s Memo at 9–10); and (3) plaintiff does not even suggest that the January 1981 Letter is the relevant contract until its Reply Memorandum. *See, generally, id.* (containing no suggestion that the January 1981 Letter is the relevant contract); *see* (Pltf.'s Reply at 14–19.) The January 1981 Letter, on the other hand, is precisely the type of extrinsic document the review of which is beyond this Court's scope of examination under relevant New York contract law. This Court thus finds that plaintiff's claims regarding the January 1981 Letter are meritless, disingenuous, and wholly unsupported in law.

Plaintiff's equitable estoppel claim is equally untenable. The law is clear that "the principle of estoppel permits recovery only when 'a representation of fact' made to a party who relies thereon with the right to so rely may not be denied by the party making the representation if such denial would result in injury or damage to the relying party." *Donnelly v. Bank of New York Co., Inc.,* 801 F.Supp. 1247, 1253 (S.D.N.Y.1992) (internal citations omitted); 1 Williston on Contracts § 139, at 600 (3d ed. 1957); *see also, Travellers Int'l AG v. Trans World Airlines, Inc.,* 722 F.Supp. 1087, 1099 (S.D.N.Y.1989).

■ Plaintiff's estoppel claims fail to meet this standard. Plaintiff submits no competent evidence that it relied on any correspondence regarding the Bonds as a basis for proceeding with the Contract. Plaintiff's only offerings on this issue are affidavits from Dr. Ahmed Abdel Ghaffar ("Ghaffar"), *see* (Pltf.'s Reply at 20–22 (citing only affidavits of Dr. Ahmed Abdel Ghaffar in support of its reliance claim)), an employee of the Egyptian government. Federal Rule of Procedure 56(e) states that affidavits submitted either in support of or opposition to a motion for summary judgment "shall be made on personal knowledge." Fed.R.Civ.P. 56(e). This Court finds that Ghaffar's Affidavits violate this Rule.

For instance, although Ghaffar states that he "presently" is Chairman of the Egyptian Ministry of Agriculture and "has occupied positions of responsibility in the Egyptian Government since 1979" (Reply Affidavit of Dr. Ahmed Abdel Ghaffar, *General Auth. for Supply Commodities, Cairo, Egypt v. Insurance Co. of North America,* 89 Civ. 6046 ("Ghaffar Reply") ¶ 2 (Oct. 27, 1993)), he does not state that he occupied a position of responsibility in either the Ministry of Agriculture or the GASC during the time that either the Contract or the Bonds were executed. *Id.;* (Affidavit of Dr. Ahmed Abdel Ghaffar, *General Auth. for Supply Commodities, Cairo, Egypt v. Insurance Co. of North America,* 89 Civ. 6046 ("Ghaffar Aff." (Sept. 14, 1992).)) He further makes no representation that he participated in GASC's decisions to go forward with the Contract and accept the Bonds, that he personally relied on any representations by defendant on behalf of GASC, or even that he has direct, first-hand knowledge of any of the events underlying the instant dispute. *See, generally,* (Ghaffar Aff.); (Ghaffar Reply.)

Moreover, plaintiff's own contemporaneously created documents undercut plaintiff's reliance claims. For instance, the May 5, 1981, letter from GASC's Legal Consultant and Project Manager M.A. El Saadany ("Saadany") makes clear that GASC did not rely on INA's representations regarding the Bonds' compliance with Article 9 of the Contract. (Letter from M.A. El Saadany, Legal Consultant and Project Manager, General Auth. for Supply Commodities, to J. Wess Tribble, Assistant Director Industry and Trade, C.S. Agency for International Development, Cairo, A.R.E. ("Saadany Letter") (May 5, 1981).) On the contrary, the May 1981 Letter reveals that plaintiff relied on *AID's opinion* of INA's representations. In the May 1981 Letter, Saadany states as follows:

> On receiving [the January 1981 Letter] *we requested the opinion of U.S. AID* and we received a letter from Mr. M. Haggar [sic], Legal Advisor of U.S. AID in Cairo.

The letter of Mr. Hagar dated Jan. 19, 1981 clearly indicated that the bonds, by their express terms, were conditional bonds which are not in compliance with the contract, and then Mr. Hagar said:

> \*      \*      \*      \*      \*      \*

> "In my opinion [the January 1981 Letter] represents the surety's intentions to accept the proof requirements as set forth in Article 9 of the Contract."

> *For the reason stated, we find the subject bonds, as interpreted in the cited INA letter of January 5, acceptable to USAID.*

> For further assurance . . . we had a meeting with Mr. Kenneth E. Fries, office of the General Counsel—AID Washington, on Feb. 20, 1981, during which we discussed this matter. . . . he indicated that he saw no basis for disagreeing with Mr. Hagar's conclusion. *Accordingly, and as a result of this, we now have assurance from two legal advisors of AID.*

> *As a result of these two legal positions,* [plaintiff went forward with the Contract]. So you can see that there was no failure on the part of GASC to object to a Surety Bond in a timely manner, *it was accepted due to the legal opinion of AID.*

*Id.* at 2–3 (emphasis added).

Assuming *arguendo* that plaintiff's so-called evidence sufficiently established that GASC relied on defendant's representations, plaintiff fails to establish that any such reliance was justifiable. Again, plaintiff's only evidence of this element are the same Ghaffar Affidavits that this Court found legally deficient above. (Pltf.'s Reply at 20–22 (citing only affidavits of Dr. Ahmed Abdel Ghaffar in support of its justifiable reliance claim).)

Finally, even if plaintiff has established justifiable reliance on defendant's representations, plaintiff's estoppel argument remains fatally flawed. As above, to succeed on a claim of equitable estoppel, claimant must establish justifiable reliance on a "representation of fact." *Donnelly,* 801 F.Supp. at 1253. In each of the documents upon which plaintiff's claims to have relied, the representations contained therein express *opinions* regarding the Bonds' compliance with the Contract, not *facts* regarding the Bonds themselves. For instance, in the January 1981 Letter, Bruney of INA states only that "the bonds, *in our opinion,* complies [sic] with Article 9 of the contract." (January 1981 Letter (emphasis added).) The above quoted portion of the Saadany Letter similarly states that the relied upon representation were those of opinions, not facts. (Saadany Letter at 2–3.) Because plaintiff's estoppel claims thus fail on all grounds, this Court finds that they are meritless and should be denied.

In addition plaintiff's claims regarding AEG's performance under the Contract have no place before this Court in the instant matter. The role of a court on a motion for summary judgment is to determine the absence of a genuine issue of material fact, Fed.R.Civ.P. 56(c); *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608; *Scottish Air,* 867 F.Supp. at 265, not to make findings of fact. This Court finds that the parties' competing arguments regarding the issue of whether AEG breached the Contract demonstrate the existence—not the absence—of genuine issues of material fact regarding this alleged breach. *See*

(Complaint ¶¶ 9–12); (Pltf.'s Memo at 5–6); (Dft.'s 3(g) Stmt. ¶ 6); (Joyner Aff. ¶ 11.) Moreover, defendant points out that "since the claim that plaintiff is entitled to payment because AEG defaulted has not been asserted in the complaint, no discovery has occurred with respect to that issue." (Dft.'s Reply at 20 n. 5.) Accordingly, this Court finds that it would be both inappropriate and premature to grant summary judgment on this issue, and thus, that plaintiff's motion should be denied.

■ Finally, this Court finds that plaintiff's claim for prejudgment interest should be rejected. To reiterate, plaintiff argues that courts may award prejudgment interest to an aggrieved party if a surety delays payment beyond proper notification, and claims that plaintiff in the instant case is entitled to prejudgment interest because INA did not pay plaintiff in response to plaintiff's demand for payment from INA. (Pltf.'s Memo at 15–16.) This Court already has found, however, that plaintiff's right to the funds secured by the Bonds depends on whether AEG breached the Contract—an issue yet to be litigated. Because GASC is not yet entitled to the funds secured by the Bonds, this Court finds that INA has perpetrated no delay in its payment to GASC, that GASC is therefore not entitled to the funds secured by the Bonds, and that GASC's claim for prejudgment interest should be denied.

## CONCLUSION

IT IS HEREBY ORDERED THAT plaintiff's motion for summary judgment is DENIED.

IT IS FURTHER ORDERED THAT defendant's motion for summary judgment is GRANTED on the issue whether the performance bonds issued by defendant should be construed as forfeiture bonds entitling plaintiff to immediate payment.

SO ORDERED.