WILLIAMS PRESS, INC., Appellant, *v.* STATE OF NEW YORK, Respondent. (Claim No. 55203.)

Third Department, July 25, 1974.

*DeGraff, Foy, Conway & Holt-Harris (John T. DeGraff* of counsel), for appellant.

*Louis J. Lefkowitz, Attorney-General (Jean M. Coon* and *Ruth Kessler Toch* of counsel), for respondent.

STALEY, JR., J. P. Claimant, a printing company, for many years prior to 1960 and for the years 1961 through 1971, was the successful bidder on the State contract for legislative printing. Prior to February 14, 1972, claimant had submitted vouchers totaling $104,295.79 to the State for legislative printing performed under its legislative printing contract for 1971. On February 14, 1972, the State notified claimant that it was offsetting a credit of $87,701.85 against moneys due claimant under its 1971 contract for overcharges paid for printing amended budget bills during the period from 1965 through 1970. The only issue before the Court of Claims and on this appeal is the construction of the contract relating to amended budget bills during the 1965 through 1970 period.

The specifications issued by the State for its legislative printing contract for the years in question as it related to budget bills are evidenced by the 1961 bid as follows:

| (h) BUDGET BILLS | | UNIT PER PRICE | | TOTAL |
|---|---|---|---|---|
| 2,000 Copies each Senate and Assembly with necessary caption changes | 1182 Pages | $27.61 | Page | $32,635.02 |
| Amended Budget Bills — | | | | |
| Composition | 5638 Lines | .98 | Line | 5,525.24 |
| Remake-Up | 494 Pages | 4.53 | Page | 2,237.82 |
| 2,000 Copies each Senate and Assembly with necessary caption changes | 3138 Pages | 13.98 | Page | 43,869.24 |

The above bid was based on the form of specifications adopted for the 1961 contract and used for subsequent years which contained a change from the former specifications used in 1960 and previous years. It is this change which resulted in the dispute between claimant and the State relative to the correct amount due claimant for printing amended budget bills for the 1965–1970 period.

The form of specifications for budget bills for the 1960 contract was as follows:

| ESTIMATED NUMBER OF PAGES | TOTAL |
|---|---|
| 905 Pages 2,000 copies for Senate | |
| 2,000 copies for Assembly with necessary caption changes | |
| 4,000 copies complete at $15.60 per page...............$14,118.00 | |

AMENDED BUDGET BILLS if required with necessary changes.

\* \* \*

| COMPOSITION-ESTIMATED NUMBER LINE CHANGES | TOTAL |
|---|---|
| 320 lines at $.55 per line.....................................$ 176.00 | |
| 25 pages re-madeup at $2.55 per page........................... 63.75 | |

ALL OTHER COSTS-ESTIMATED NUMBER OF PAGES

| 905 pages 2,000 copies for Senate | |
|---|---|
| 2,000 copies for Assembly with necessary caption changes | |
| 2,000 copies Senate at $7.90 per page..................$ 7,149.50 | |
| 2,000 copies Assembly at $7.90 per page................$ 7,149.50 | |

Total Bid for Item 10-A Budget Bills                    $28,656.75

The material changes in form thus were the elimination of a line for 4,000 copies complete at a price per page for the original budget bill and the use of one line for 2,000 copies each for Senate and Assembly at a price per page, and the elimination in the bid for amended budget bills of the separate items of 2,000 copies for the Senate at a price per page, and 2,000 copies for the Assembly at a price per page and the use of one line for 2,000 each Senate and Assembly at a price per page.

The testimony reveals that original budget bills were identical, but that amended budget bills might differ since amendments made in one house were not always the same as amendments made in the other house. Under the 1961 contract, when a budget bill was amended, the printing for the number of pages amended in the Senate was charged to the Senate at the price per page bid, and the printing for the number of pages amended in the Assembly was charged to the Assembly at the price per page bid. Claimant continued this practice for the years of 1965–1970 interpreting the form of the bid for those years for printing amended budget bills on the same basis as it had adopted under the form of the bid contained in the 1960 contract and years prior thereto.

The basis for the State's offset is its interpretation that since the form of specification for original budget bills and amended budget bills for the years in question is the same, claimant is limited to the price bid per page for amended budget bills, and is entitled to be paid at that price only once and not at that price

by both the Senate and the Assembly. The State, therefore, claims there has been double billing for printing amended budget bills for 1965–1970, and that the offset charged is valid. The Court of Claims sustained the State's contention.

Claimant's main contentions are that the change in specifications for amended budget bills from two lines in 1960 to one line in 1961 created an ambiguity for that year and subsequent years; that claimant followed the same bidding pattern for every year from 1961 through 1971 in reliance upon the Comptroller's approval of its vouchers, and that a practical construction of the contracts for the 1965-1970 period would result in a finding that the bids were in exact conformity with bids for other bills; that in view of the payments after audit for a six-year period, a fair review of the practice resulting in the charge of offsets should have been limited to a one-year period; and that the State's offsets violated the constitutional requirements of procedural due process.

The wording of the specifications in the 1961 bid proposal was the same for original budget bills and amended budget bills. Claimant clearly understood that the bid for original budget bills called for 4,000 copies at a price per page, and it, therefore, should have understood that when identical language was used for amended budget bills, the same result would be reached calling for 4,000 copies at the price per page submitted in its bid. If the bid specifications were clear and unambiguous as to the original budget bills, they were likewise clear and unambiguous as to amended budget bills. We agree with the Court of Claims where it held that:

" The detailed specifications in each contract were clear and unequivocal and the actual bid which ripened into a contract was clear and without ambiguity. The bid form was the same in each of the contracts (Exhibits ' A '—' F ', inclusive) for the period in question. For example, the bid form and bid for 1965 read as follows: (Exhibit ' A ')

| ' BUDGET BILLS 2,000 Copies each Senate and Assembly with necessary caption changes | Unit Per | Total |
|---|---|---|
| 1,475 Pages | 18.97 Page | 27,980.75 |
| Amended Budget Bills Composition | | |
| 632 Lines | .67 Line | 423.44 |

' Remakeup

| | | |
|---|---|---|
| 87 Pages | 3.11 Page | 270.57 |
| 2,000 copies each | | |
| Senate and Assembly | | |
| with necessary | | |
| caption changes | | |
| 1,163 Pages | 9.61 Page | 11,176.43 |
| | Total | $39,851.19 ' |

(Underlining added.) The underlined section is the area in dispute. Claimant had bid the price of $9.61 for an estimated requirement of 1,163 pages; or, a total bid price of $11,176.43. Once this bid was accepted, as it was, it became the contract between the parties. If, as claimant contended, it intended to separately voucher the State for 2,000 copies to the Senate at $9.61 a page and 2,000 copies to the Assembly at $9.61 a page, it should have either so stated in the bid form or it should have doubled the final bid amount from $11,176.43 to $22,352.86. It did not do so and, in our opinion, it was bound to charge only $9.61 a page for 4,000 copies of cosponsored amended budget bills."

Claimant further contends that the State's failure to object to its billing practices and payment of vouchers, as submitted, over a period of years, was, in effect, a ratification of the payments and that the custom and usage entered into by both parties in years prior to 1961 should result in a practical construction of the contracts for the 1965–1970 period favorable to claimant. However, the contracts did not authorize the charges as vouchered by claimant, and they were thus not in accordance with the contract and their payment became illegal and invalid. Errors made by State employees cannot bind the State or prevent recoupment of unauthorized payments. (*Wells* v. *Johnston,* 171 N. Y. 324; *Board of Supervisors of Richmond County* v. *Ellis,* 59 N. Y. 620; *People* v. *Journal Co.,* 158 App. Div. 326, affd. 213 N. Y. 1.)

In *People* v. *Journal Co.* (*supra,* pp. 7-8), Judge Cardozo, writing for the Court of Appeals, stated as follows: "We cannot sustain the defendant's argument that the approval of its bills by the comptroller is an audit which bars the state from the recovery of the illegal payments. * * * The public funds may not be gratuitously distributed at the will of any officer. (*Village of Ft. Edward* v. *Fish,* 156 N. Y. 363, 374.) It might as well be urged that a second payment of the same bill would be protected if a comptroller, knowing that it was a second payment, determined to allow it. In the present case,

both the public officers who approved the bills and the defendant which presented them, acted in good faith. None the less, the conceded facts demonstrate that the double payment was illegal, and no audit by any public officer could make it anything else."

Since the contracts for 1965–1970 were unambiguous, the acts of the parties relating to their construction, if erroneous, cannot change the terms of the contract or change an illegal payment into a legal one. The record is very convincing to the effect that claimant's intention was to submit its bids for 1965–1970 on the same basis and to achieve the same payments for its services for printing amended budget bills as it received under the form it bid in the 1960 contract. However, to obtain that result, it should have bid double the amount for the price per page for printing amended budget bills for the 1965–1970 period. The fact is that it did not do so, and it is, therefore, bound by its bid and the contract entered into by the parties.

Claimant lastly contends the State's offset practice violated the constitutional requirements of procedural due process, and that if the Comptroller believed that claimant had been overpaid from 1965 through 1970, the proper remedy was to bring an action in the Supreme Court. Claimant argues that the Comptroller's action has forced claimant to file its claim in the Court of Claims which has deprived it of its right to a jury trial, shifted the burden of proof from the Comptroller to claimant, and prevented claimant from pleading a cause of action for reformation, based on mutual mistake which could not be pleaded in the Court of Claims which has no equity jurisdiction.

The action of the Comptroller in offsetting the overpayments against current bills for services performed is certainly reasonable and legal. The right to offset in this manner has been approved by the courts. (*United States* v. *Munsey Trust Co.,* 332 U. S. 234; *Capitol Distrs. Corp.* v. *Kent's Rest.,* 173 Misc. 827.)

In *United States* v. *Munsey Trust Co.* (*supra,* pp. 239–240), United States Supreme Court declared that "federal statute gives jurisdiction to the Court of Claims to hear and determine 'All set-offs, counterclaims * * * whether liquidated or unliquidated, or other demands whatsoever on the part of the Government * * * against any claimant against the Government in said court.' * * * This power given to the Court of Claims to strike a balance between the debts and credits of the government, by logical implication gives power to the Comptroller General to do the same, subject to review by that court."

Similarly, in New York State offsets to State claims are within

the Comptroller's authority as was clearly stated by Justice BERGAN in *Capitol Distrs. Corp. v. Kent's Rest. (supra,* p. 828):

" Since the Comptroller acts for the State in its fiscal affairs generally, and since the payment of any money under the control of the State is void unless approved by his audit * * * it would seem that he has the right to offset any valid claim of the State against one to whom money under his control is due from the State."

The Comptroller has been authorized by the Legislature to " examine, audit and settle the accounts of all public officers and other persons indebted to the state, and certify the amount and balance due thereon." (State Finance Law, § 8, subd. 3.) If this power could not be employed as the Comptroller has done in this case, it would seem that whenever a contract dispute arose the State would be forced to pay over all of what claimant demanded and then sue for recovery of disputed amounts. This could not logically have been the intent of the Legislature in empowering the Comptroller to settle the State's accounts and in empowering the Court of Claims to entertain counterclaims.

This action is based on a contract with the State and claimant seeks to recover moneys due under its contracts which the State, alleging overpayments, has withheld from claimant. The claim is against the State and may be maintained only in accordance with the consent of the State in the Court of Claims. Sections 8, 9 and 12 of the Court of Claims Act confer very broad jurisdiction upon the Court of Claims to hear and determine all claims against the State, and this broad grant of power necessarily implies the right to afford equitable relief where the same may be incidental to a claim for a money judgment. (Cf. *Psaty* v. *Duryea,* 282 App. Div. 94.)

The judgment should be affirmed, with costs.

GREENBLOTT, J. (concurring). I concur in the decision of Mr. Justice STALEY which affirms the judgment of the Court of Claims on the merits of the controversy. However, while also agreeing with the conclusion that the Court of Claims was a proper forum for this action, I disagree with the reasoning of Mr. Justice STALEY on that point. The breadth of the jurisdiction of the New York State Court of Claims under the Constitution and statutes of New York cannot be determined by reference to a *Federal* statute establishing jurisdiction of the United States Court of Claims, wherefore *United States* v. *Munsey Trust Co. (supra),* relied on by Mr. Justice STALEY, is inapposite. In my view, our decision in *Valentino* v. *State of New York*

(44 A D 2d 338) is determinative. We there held that when a claimant commences suit in the Court of Claims, he impliedly consents to the interposition of a counterclaim " at least where [it] arises out of the same or similar transactions giving rise to the claimant's cause of action so that there will be an identity of factual issues to be resolved in determining both the claim and the counterclaim." (*Id.*, p. 340.) Nor do I see any basis for a distinction where a counterclaim in the nature of a recoupment rather than a setoff is pleaded, not only because the historic limitations on counterclaims by way of setoff or recoupment have been eliminated (see 3 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 3019.02), but more particularly because the controlling factor is the identity of issues arising out of the dispute over the 1965-1970 contracts and the 1971 contract, which clearly were " similar transactions " within the intendment of *Valentino*. The fact that the Comptroller has forced the claimant to sue in the Court of Claims by withholding payment, while arguably improper from an ethical point of view, was legally unobjectionable. Therefore, once an action has properly been commenced in that forum, claims in favor of the State arising out of the " same or similar transactions " whether denominated as a counterclaim by way of recoupment or by way of setoff can be properly heard in the same forum.

KANE, J. (dissenting). I agree with claimant that the State's setoff was improperly interposed and the Court of Claims was without jurisdiction to hear it. That court possesses jurisdiction to hear and determine " claims  *  *  *  by the state against claimant  *  *  *  as the legislature may provide " (N. Y. Const., art. VI, § 9). However, the Legislature has not elaborated upon that provision beyond reiterating the authority of that court to resolve " any claim in favor of the state against the claimant " (Court of Claims Act, § 9, subd. 3). Although it seems well settled that, as a condition to being sued, the State may validly interpose a counterclaim against a claimant in that forum arising out of the same or similar transactions with an identity of factual issues to be resolved (*Valentino* v. *State of New York*, 44 A D 2d 338; *Gross & Son* v. *State of New York*, 214 App. Div. 386, mod. 243 N. Y. 629), I cannot accept the State's interpretation of " claim " so as to include the particular setoff asserted by it in this action, nor its argument that under modern practice counterclaims include both recoupments and setoffs without distinction (see 3 Weinstein-Korn-Miller, N. Y. Civ. Prac., pars. 3019.01, 3019.02, 3019.03).

Williams Press has the right to have the State's claim against it determined by a court of general jurisdiction to preserve its right to a trial of the issues by jury and to present any equitable defenses it may possess to defeat that claim. The implicit waiver of such rights as a condition to suing the State in a court of limited jurisdiction should not be further broadened so as to permit the State to maintain its setoff on matters wholly separate and unrelated to claimant's underlying 1971 contract action. There can be no similarity of issues to be resolved so as to justify the interposition of the type of setoff asserted in this case for the very simple reason that there never was a dispute concerning the State's liability under that 1971 agreement. The related nature of prior dealings between these parties should not be permitted to mask the inherently separate identity of the Williams Press claim. Attempts to settle accounts with a vendor by offsetting prior unrelated overpayments against sums currently due are understandable; the vendor might agree to such action and avoid litigation. However, it would be constitutionally offensive to allow the State to carry that attempt to the point of effectively forcing a vendor to choose between accepting that offset or maintaining an action for sums concededly due in a forum without the benefit of a jury or equity which would otherwise have been available if the State had commenced action on its claim in a court of general jurisdiction. A contractor with the State knows and expects that, should a dispute not be settled, its claim and any recoupment alleged by the State can only be judicially resolved by the Court of Claims under its practice. What such a party should not expect is that prior unrelated matters, never previously disputed or contested in a court of general jurisdiction, might some day be resurrected by the State in opposition to its present just claim. The establishment of such a dangerous precedent would expose those who deal with the State to countless unanticipated pitfalls. I do not mean to suggest that the State is estopped from recovering illegal or unauthorized payments after audit (cf. *People* v. *Journal Co.*, 213 N. Y. 1) or that the State must always pay over all money due before suing for disputed amounts owed to it (cf. *Capitol Distrs. Corp.* v. *Kent's Rest.*, 173 Misc. 827). Rather, the State should not be permitted to neglect or abandon its previously available remedies until such time as it unilaterally decides to frustrate payment of a valid claim. *United States* v. *Munsey Trust Co.* (332 U. S. 234) is not to the contrary because it was clear in that case that the Federal statutes specifically empowered District Courts to determine all "setoffs"

by the government against its claimants. Here the statutory framework is not so clear and I simply decline to interpret a "claim" to include the type of setoff maintained by the State in this case which it could, and still may, assert in a court of general jurisdiction. In my view, the situation presented is somewhat similar to *Horoch* v. *State of New York* (286 App. Div. 303) which refused to allow the State to implead a third-party defendant in a Court of Claims action. Williams Press obviously stands more in the position of such a third-party defendant as to the overcharges alleged for the 1965 through 1970 period than as a claimant against whom the State seeks to maintain a true counterclaim under the 1971 contract.

Even if such a defensive setoff as asserted in this case had been properly interposed, we would be compelled to reverse the determination favoring the State on factual grounds. Nowhere did the State adduce proof supporting the computations or total amounts of such alleged overpayments.

I would grant judgment to the claimant in the sum of $87,807.53, together with appropriate interest, leaving to the State its existing remedies in a court of competent jurisdiction.

REYNOLDS, J. (dissenting). I agree completely with the dissent of Mr. Justice KANE. In addition I agree with claimant's contention that there existed an ambiguity precipitated by the State's 1961 change in bid forms which supports the billing practices utilized by claimant for the years involved. In 1961 the bid forms for amended budget bills were changed from two lines to one. The majority here and the Court of Claims would construe the 1961 one-line bid of $9.33 per page as covering the delivery of 2,000 copies to each house or a total of 4,000 copies. With this construction I cannot agree.

The year before claimant had bid a total of $18.12 per page ($9.06 per page for each house on the two-line bid) for the same 4,000 copies. It is obvious they were thus bidding $9.33 per page for each 2,000 copies delivered to each house or $18.66 for the 4,000 total copies. Any other assumption is incongruous with claimant's bidding practices on other bills and the obvious fact that printing costs were increasing and not decreasing at the time. Moreover, it is also obvious and important that the State on auditing the vouchers submitted for each of the years in dispute agreed with this procedure. It is one thing to say as the majority does that the State cannot be held for errors of its employees and quite another to utilize a course of conduct to give a practical construction to an ambiguous contractual provision. Thus, in my opinion, the intent of the

parties was clearly that claimant should be paid $9.33 per page for each 2,000 copies delivered and not for the total 4,000 copies. In addition it is not questioned that the charges made were reasonable. Rather, the State, in my opinion, is attempting to advance a construction of the contract which not only is erroneous in light of prior bids for the same work but unfair to claimant who did the work on a reasonable assumption based on prior bidding that it would be paid $9.33 per page for each 2,000 copies printed. The members of this court agree that both the result and the actions of the State herein are inequitable; I would go further and say they are unconscionable and illegal. Accordingly, I vote to reverse and grant judgment to the appellant in the sum of $87,807.53.

SWEENEY, J., concurs with STALEY, JR., J. P.; GREENBLOTT J., concurs in a separate opinion; KANE, J., dissents and votes to reverse in an opinion in which REYNOLDS, J., concurs; REYNOLDS, J., dissents and votes to reverse in a separate opinion.

Judgment affirmed, with costs.