Gabrielli, J.
 

 Appellant is a printing corporation which, during the period from 1953 through 1972, was the successful and often the sole bidder on each of the State’s annual contracts for legislative printing. When Williams Press submitted vouchers totaling $104,295.79 to the State for legislative printing performed under its contract for the 1971 session, the State, on February 14, 1972, informed appellant that a credit of $87,701.85 was being deducted from the moneys due Williams Press on the ground that this amount represented claimed overcharges on vouchers for legislative printing which had been presented to and paid by the State during
 
 *437
 
 the years 1965 through 1970. Although the disputed portions of the 1965 through the 1970 contracts have to do with amended budget bills, Williams Press asserts that the controversy between it and the State had its genesis in ambiguities contained in the State’s specifications for the 1961 contract for the printing of budget bills and amended budget bills.
 

 The specifications for printing of budget bills and amended budget bills in the 1960 contract
 
 [1]
 
 read in full as follows:
 

 "Item 9 - BUDGET BILLS
 

 ESTIMATED NUMBER OF PAGES:
 

 1107 pages 2,000 copies for Senate,
 

 2.000 copies for Assembly, with necessary caption changes,
 

 4.000 copies complete at $17.88 per page $19,793.61
 

 AMENDED BUDGET BILLS
 

 COMPOSITION
 

 ESTIMATED NUMBER OF LINE CHANGES:
 

 945 lines at $.63 per line $595.35
 

 852 pages re-makeup at 2.93 per page $2,496.36
 

 ALL OTHER COSTS ESTIMATED NUMBER OF PAGES:
 

 2082 pages 2,000 copies for Senate,
 

 2.000 copies for Assembly, with necessary caption changes,
 

 2.000 copies Senate at $9.06 per page $18,862.92
 

 2.000 copies Assembly at $9.06 per page $18,862.92
 

 Total bid for Item 9 — Budget Bills: $60,610.71”
 

 It should be noted that a
 
 single
 
 per page bid price was required, for
 
 original
 
 budget bills and that two
 
 separate
 
 per page bids were required for the Senate and the Assembly printing of
 
 amended
 
 budget bills. Apparently the contract for 1960, and in fact for several years prior thereto, contained two
 
 separate
 
 per page bid prices, one for amended Senate budget bills and the other for amended Assembly budget bills, since each house had the exclusive right to control the amendment of its own bills and the number of pages in the bills amended by the Senate often differed from the number of pages in corresponding bills amended by che Assembly. In some in
 
 *438
 
 stances, a budget bill is amended in the Senate and passed in both houses without any amendment to the Assembly bill, or vice versa. In contrast, only one line was required for
 
 original
 
 budget bills because the same bill is introduced in both houses and the number of pages is necessarily the same for both houses.
 

 The State apparently changed the specifications in the 1961 legislative printing contract by condensing them and by providing for only
 
 one
 
 line for
 
 amended
 
 budget bills. The bid specifications for the 1961 contract
 
 [2]
 
 read in full as follows:
 

 " ESTIMATED UNIT PER TOTAL
 

 REQUIREMENTS
 

 (i) BUDGET BILLS
 

 2.000 copies each Senate and Assembly with necessary caption
 

 changes 950 pages $18.42 page $17,499.00
 

 AMENDED BUDGET BILLS
 

 Composition 816 lines .65 line 530.40
 

 Re-makeup 100 pages 3.02 page 302.00
 

 2.000 copies each Senate and Assembly with necessary caption changes 550 pages 9.33 page 5,131.50
 

 Total (i) $23,462.90”
 

 Williams Press contends that the 1961 specifications created a bidding dilemma in relation to amended budget bills because only
 
 one
 
 bid line was provided for amended budget bills, instead of the
 
 two
 
 lines in the 1960 contract and its predecessor, while the 1961 specifications for "general” and "local” bills continued to provide two lines so that
 
 separate
 
 bids were required for all amended Senate and Assembly bills other than budget bills. Thus, as a result of the State’s change in its 1961 specifications, Williams Press, having decided to charge $9.33 per page for each amended budget bill, was required to make an election between the following methods of bidding: (1) to bid $18.66 per page for 4,000 copies and voucher this amount to both houses jointly as it had traditionally done
 
 *439
 
 with original budget bills; or (2) to follow the practice between the parties that had prevailed for many years and bid, as it did, $9.33 per page for 2,000 copies and itemize each voucher separately at that rate for each page of amended budget bills in
 
 each
 
 house as it had done since 1953. Throughout the course of this litigation, appellant has alleged that it opted for the latter method for two valid reasons: (1) a joint billing would not ordinarily be divided equally between the two houses because the number of pages of amended Senate bills might and often did differ from the number of pages of amended Assembly bills; and (2) to apportion the costs properly under a joint bid it would have been necessary to prepare vouchers for each house which divided the bid price by two and then multiply that figure by the number of amended budget bill pages in each house.
 

 In holding that the State was overcharged in the sum of $87,701.85 and that the State had the power to offset those overcharges against moneys due Williams Press, both the Court of Claims and the Appellate Division, by a divided court (45 AD2d 397), held that the specifications in each of the contracts from 1965 through 1970, which were identical to the 1961 specifications, were clear, unequivocal and without ambiguity. More specifically, the trial court and the majority at the Appellate Division reasoned that if appellant intended to separately voucher the State for 2,000 copies to the Senate at a certain price per page and 2,000 copies to the Assembly at the same price per page, it should have doubled the final amount of its bid for the years 1965 through 1970.
 
 [3]
 

 At the outset it should be noted that the construction of a contested contractual provision presents a question of law which is fully reviewable by the Court of Appeals (cf.
 
 New Era Homes Corp. v Forster,
 
 299 NY 303;
 
 Solomon v Atlantis Steel Partition Co.,
 
 295 NY 80). In
 
 Matter of City of New York (Vernon Parkway)
 
 (285 NY 326, 331) then Judge Loughran expressed this principle as follows: "While the construction of writings is, to be sure, matter of law in the sense that it is an affair for a judge, still the particulars of the process of ascertaining the disclosed intention of a writer are for the most part items of fact. Such an inquiry may nevertheless be a question of law in the sense of the phrase 'questions of law’
 
 *440
 
 as that phrase is used in the constitutional limitations upon the jurisdiction of this court.”
 

 Appellant contends that the Court of Claims and the majority at the Appellate Division, by focusing their attention on the single paragraph relating to "Budget Bills”, and finding no ambiguity in that paragraph, have overlooked the basic principles that the construction of any contract must give due consideration to: (a) the entire contract; and (b) the disclosed intent of the parties. Thus, Williams Press, argues, and correctly we think, that we should apply the standard enunciated by Chief Judge Lehman in
 
 Empire Props. Corp. v Manufacturers Trust Co.
 
 (288 NY 242, 248-249) wherein it was stated: "A written contract will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose.’ (3 Williston on The Law of Contracts, § 618.) * * * The meaning of a writing may be distorted where undue force is given to single words or phrases. We read the writing as a whole. We seek to give each clause its intended purpose in the promotion of the primary and dominant purpose of the contract. * * * The object which the parties had in view is, in this case, clear, and so are the motives which dictated their choice of words. The construction which has been placed upon the words the parties have chosen might defeat the object of the parties. * * * The courts should then choose that construction which will carry out the plain purpose and object of the indenture.”
 

 Viewing the 1961 State specifications from such a perspective, we think there was ambiguity in the format for bidding on amended budget bills. This ambiguity was perpetuated throughout the 1965-1970 period since the State specifications for those years were identical to the 1961 specifications. It is interesting to note that for a number of years, including, of course, the years critical to this litigation, the State honored the vouchers submitted by appellant upon the basis now questioned by the State. Obviously, appellant properly had every reason to believe and conclude that the claimed ambiguity was interpreted by both parties as a recognition that the State would pay, as before, the pet page price for each set of bills delivered to each house. If Williams Press had opted for the alternative suggested by the majority at the Appellate Division, it would have bid $18.66 per page but in that event it would have been required to bill one half of that amount to
 
 *441
 
 each house. No other choices were available under the specifications prepared by the State, and, of course, it would have been hazardous and misleading for the appellant to deviate from the joint price per page stated in the specifications for public bidding.
 

 Since we conclude that there were ambiguities in the State’s specifications for amended budget bills, the parol evidence rule does not preclude us from examining the prior dealings between the parties in order to ascertain their intent at the time of the 1961 contract. In 1960, Williams Press had bid a total of $18.12 per page ($9.06 per page for eách house on the two-line bid) for 4,000 copies. That being the case, it is obvious .that appellant in 1961 was bidding $9.33 per page for each 2.000 copies delivered to each house or $18.66 for the total 4.000 copies. Under the State’s construction of the contract, which we reject, Williams Press was entitled to $18.12 per page for 4,000 copies of amended budget bills in 1960 but only $9.33 per page for 4,000 copies in 1961, a reduction of approximately 50%, despite the fact that printing costs were increasing at the time. Thus, as one of the dissenters at the Appellate Division stated, "the intent of the parties was clearly that claimant should be paid $9.33 per page for each 2,000 copies delivered and not for the total 4,000 copies.” (45 AD2d 397, 406-407.) Moreover, there is no dispute as to the value of the services rendered by Williams Press; instead, the State argues that although the appellant could have properly doubled its bid, it did not do so and is bound by its bid and the contract which arose therefrom. Inasmuch as the State prepared the ambiguously worded specifications, we do not feel constrained to sanction such an inequitable result.
 

 In so holding, we in no way disrupt or overrule the principle that errors made by State employees cannot bind the State or prevent recoupment of unauthorized payments
 
 (Wells v Johnston,
 
 171 NY 324;
 
 People v Journal Co.,
 
 213 NY 1). However, such is not the case here. The State received exactly what it bargained for, and, in the words of one of the dissenting Justices at the Appellate Division, "is attempting to advance a construction of the contract which not only is erroneous in light of prior bids for the same work but unfair to claimant who did the work on a reasonable assumption based on prior bidding that it would be paid $9.33 per page for each 2,000 copies printed.” (45 AD2d 397, 407.)
 

 
 *442
 
 Accordingly, the order of the Appellate Division should be reversed, with costs, and judgment granted to claimant.
 

 Chief Judge Breitel and Judges Jasen, Jones, Wachtler, Fuchsberg and Cooke concur.
 

 Order reversed, etc.
 

 [1]
 

 . The corresponding specifications for budget bills and amended budget bills were identical from 1953 through 1960.
 

 [2]
 

 . The corresponding specifications for budget bills and amended budget bills were identical from 1961 through 1973.
 

 [3]
 

 . The State did not attempt to recoup any of its pre-1965 payments since it conceded that recovery was barred by the Statute of Limitations.