**THE MCGRAW–HILL COMPANIES, INC., Plaintiff,**

v.

**VANGUARD INDEX TRUST and The Vanguard Group, Inc., Defendants.**

**No. 00 CIV 4247.**

United States District Court, S.D. New York.

April 25, 2001.

---

**9.** 52 F.3d 1163.

**10.** *Id.* at 1168 (citing *Chevron U.S.A., Inc.*, 467 U.S. at 843–45, 104 S.Ct. 2778).

**11.** Pl. Mem. 11–13.

Weil, Gotshal & Manges LLP by R. Bruce Rich, Irwin H. Warren, Howard B. Comet, Benjamin E. Marks, Natalia Porcelli, New York City, for Plaintiff The McGraw–Hill Companies, Inc.

Willkie Farr & Gallagher by Stephen Greiner, Brian E. O'Connor, Colin F. Bell, New York City, for Defendants Vanguard Index Trust and The Vanguard Group, Inc.

### MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT AND DENYING DEFENDANTS' MOTION FOR JUDGMENT

HELLERSTEIN, District Judge.

This case involves trademark and other intellectual property rights to famous financial service indices: the Standard & Poor's 500 Composite Stock Price Index and two related S & P indices. Plaintiff, The McGraw–Hill Companies, Inc., owns the property rights to the relevant trademarks and indices. For more than fifteen years, Defendants, Vanguard Index Trust and the Vanguard Group, Inc., have been using the S & P trademarks, and the index data symbolized by the trademarks, in the sales and marketing of Vanguard's open-end mutual funds based on those indices. Recently, Vanguard has developed a new class of securities for its index mutual funds, a class of exchange-traded securities called VIPERs that will be issued to broker-dealers to enable trading in large blocks upon securities exchanges throughout the trading day. The issue before me is whether the agreements between McGraw–Hill and Vanguard by which Vanguard has the right to use the S & P trademarks and indices extend to VIPERs, or whether, as an unlicensed use, Vanguard's proposed use would infringe on McGraw–Hill's property rights.[1]

1. I refer in this opinion to McGraw–Hill and Vanguard without distinguishing between

McGraw–Hill and Vanguard both have filed motions for judgment pursuant to Federal Rule of Civil Procedure 52(c), on papers after discovery and as if after a full trial.[2] For the reasons set forth below, I grant Plaintiff's motion and deny Defendant's motion. This memorandum constitutes my findings of fact and conclusions of law.

## I. *Factual Background*

Plaintiff, McGraw–Hill, is an industry leader in business publications, financial information and media services. Its Standard & Poor's ("S & P") division designs, maintains and publishes financial indices, including the S & P 500 Composite Stock Price Index ("S & P 500") and other such indices. The S & P 500 is a statistical index based on stock prices of selected and weighted samplings of common stocks of leading United States public companies in a variety of industries. McGraw–Hill owns the trademarks "S & P" and "S & P 500," which have been registered with the United States Patent and Trademark Office, and the unregistered trademarks "Standard & Poor's," "Standard & Poor's 500," and "500." S & P also designs and publishes comparable indices based on other groupings of stocks, relating to other segments of the securities markets.

Financial services companies, analysts and investors regularly refer to S & P indices, including the S & P 500, as benchmarks for measuring the performance of investments, and also may obtain licenses from McGraw–Hill for more active use of the S & P indices and trademarks. The licenses entail two categories of related intellectual property rights: the right to use the data—that is, the shifting composite of common stocks—that make up the S & P index, and the right to use the S & P trademarks symbolizing the data.

Defendant The Vanguard Group, Inc. is a leading manager and seller of mutual funds. Vanguard, through its affiliate, Vanguard Index Trust, also a Defendant in this case, and Vanguard Index Funds, the Index Trust's successor, has been a leader in popularizing index funds: funds designed to hold a portfolio of stocks that mirror the composition of a financial index, for example, the S & P 500. In that connection, Vanguard has been a licensee of Standard & Poor's for sixteen years.

Generally, investment companies may be closed- or open-end funds. A closed-end fund has a fixed number of outstanding shares, traded throughout the day on the stock exchanges where they are listed or over-the-counter, through broker-dealers and at prices determined by market forces, generally at a discount from the fund's overall net asset value. In contrast, shares of an open-end fund are continuously issued and redeemed at prices determined by the fund's net asset value, generally as of the close of business of the day of redemption. Open-end shares typically do not trade in the secondary market.

Beginning in 1993, a hybrid form of investment company, an exchange-traded fund ("ETF"), was developed. As with all investment companies, purchasers of shares in an ETF gain an undivided interest in the portfolio of securities held and managed by the fund. While technically open-end funds, ETFs trade in the secondary market, typically on an exchange and at prices determined by the market, in the same manner as closed-end funds. However, because ETF shares may be created and redeemed by market makers at net

---

them and their respective subsidiaries, affiliates and divisions. VIPERs is an acronym for Vanguard Index Participation Equity Receipts.

**2.** I suggested, and the parties agreed to, this procedure, as an alternative to motions for summary judgment under Federal Rule of Civil Procedure 56.

asset value, albeit in large denominations commonly known as creation units, ETF shares typically do not trade at prices that vary greatly from their net asset values.

Vanguard now proposes to issue a new type of ETF, not as a separate fund, but as a new classification of shares in three existing Vanguard mutual funds based on S & P indices. The new product is to be called VIPERs, an acronym for Vanguard Index Participation Equity Receipts. By this action, McGraw–Hill seeks to enjoin Vanguard from issuing that product, claiming that Vanguard's issuance of VIPERs would improperly enlarge, and thus violate, the terms of a January 1, 1988 license agreement between the parties by which McGraw–Hill licensed Vanguard to use its S & P trademarks and indices in connection with Vanguard's Index Trust as it then had been operating, as an open-end mutual fund. Vanguard contends, in defense, that the 1988 license agreement authorized it to use the S & P trademarks and indices for the relevant Vanguard funds generally, and that the license grant thus encompasses its proposal to market and sell VIPERs.

The 1988 license agreement succeeded an earlier agreement dated April 24, 1985. Pursuant to the 1985 agreement, McGraw–Hill licensed Vanguard to use "the S & P 500 and the data included in the S & P 500 ... and S & P's trademarks and trade names solely in connection with the operation and management of the Vanguard Index Trust," as described in a Prospectus of the Index Trust dated April 30, 1985 and attached to the 1985 agreement. McGraw–Hill contends that the scope of the license was thus limited by the terms of the Prospectus and its description of the product offered by the Index Trust: shares of an open-end mutual fund designed to provide investment results corresponding to the performance of the S & P 500 index. The Prospectus stated that Vanguard's purpose was to "attempt[ ] to duplicate the investment results of the [S & P 500] Index" by using the fund's capital to buy and sell stock weighted and regularly adjusted to correlate with the composition of the S & P 500 index.

> The Trust's capital will be invested in no fewer than the 200 stocks having the largest weighings in the Index.... The management of the Trust generally selects stocks for the Trust's portfolio in the order of their weighings in the Index, beginning with the heaviest weighted stocks. The percentage of the Trust's assets to be invested in each stock is approximately the same as the percentage it represents in the Index. Temporary cash balances, normally not expected to exceed 1% of net assets, may be invested in short-term money market instruments.

The composition of the portfolio was to be regularly adjusted to achieve a correlation with the composition of the S & P 500 index.

The 1988 agreement incorporated and attached the 1985 agreement, but provided also that the 1988 agreement was the "entire agreement," and "supersede[d]" all prior agreements, including the 1985 agreement, "with respect to the subject matter of [the 1988] Agreement." Since January 1, 1988, Vanguard has created at least seven additional open-end mutual funds that track other S & P indices for various segments of the stock market, each time under specific license from McGraw–Hill reflected in separate written agreements or amendments.

On December 18, 1998, the Board of Trustees of Vanguard Index Funds approved a proposal to create a class of exchange-traded shares in certain existing Vanguard index funds. The proposal was that the selected index funds would issue and redeem shares at prices determined

by the previous day's closing net asset values in the conventional open-end mutual fund manner, but also issue a class of shares that could be traded throughout the day, supported by issuances and redemptions of "creation units," or large blocks of shares, to qualified broker-dealers who would support the trading. The Board expressed its belief that the addition of such shares could reduce Vanguard's exposure to large and unbalancing swings of large-scale buying and selling in the course of day-trades and other short-term trading strategies, avoid tax consequences to its shareholders by reason of such transactions, and improve its competitive position in the mutual fund industry. The proposed new class of shares were to be called VIPERs: Vanguard Index Participation Equity Receipts.

In May 1999, Vanguard submitted an application to the United States Securities and Exchange Commission ("SEC") seeking exemptive relief from the Investment Company Act of 1940 in connection with its proposed issuance of VIPERs. The SEC granted the requested exemption conditionally, requiring Vanguard to agree not to advertise or market VIPERs "as a mutual fund investment," or "as shares of an open-end investment company or mutual fund," or to "make reference to an 'open-end fund' or 'mutual fund' " except that it could compare or contrast VIPERs with the shares of a conventional open-end management investment company. Vanguard also agreed to use a separate Prospectus and separate marketing materials to sell VIPERs. On May 12, 2000, a year after its application to the SEC, Vanguard

received approval and filed a registration statement with the SEC, publicly announcing its plans to market and sell VIPERs.

McGraw–Hill alleges that ETFs generally, and VIPERs particularly, were not in existence and were not contemplated by the parties at the time of the 1985 and 1988 contracts and that VIPERs are a separate and distinct financial product, not simply another conventional class of shares within an existing mutual fund. McGraw–Hill contends that Vanguard's issuance of VIPERs would be an unlicensed use of the S & P trademarks and data, breaching the parties' license agreements. Vanguard disputes McGraw–Hill's contentions, alleging that its license from McGraw–Hill ran, not to particular classes or categories of shares, but to its funds, and that VIPERs, no less than open-end shares, are within the license grant. Hence, the opposing motions for judgment.[3]

## II. *The License Agreements in Greater Detail*

The disputed licenses for use of the S & P 500 trademarks and indices appear in two documents: a letter agreement effective as of May 15, 1985 and an agreement effective as of January 1, 1988.

The first contract, dated April 24, 1985, is a two-page letter agreement executed by Standard & Poor's Corporation, Vanguard Index Trust, and The Vanguard Group. Pursuant to the letter agreement, and effective May 15, 1985, Vanguard acquired the right to use the S & P 500 index data and the S & P marks for an annual license fee of $5,000, "solely in connection with the

---

**3.** *See* n. 2, *supra.* I denied Vanguard's motion to dismiss at the outset of the case because of ambiguities in the contract terms. After discovery, the parties filed these motions for judgment under Federal Rule of Civil Procedure 52 and have consented that I determine any disputed facts. As is apparent from this opinion, the background is complex but not essentially disputed. Acting pursuant to Rule 52 makes it unnecessary to make a separate determination whether my interpretation of a complex and somewhat ambiguous contract is a determination of fact or law, as would be necessary under the summary judgment rule, Federal Rule of Civil Procedure 56.

operation and management of the Vanguard Index Trust, as described [in an attached Prospectus]." The body of the letter agreement reads as follows:

This will confirm the agreement, effective as of May 15, 1985, between Standard & Poor's Corporation ("S & P") and the Vanguard Index Trust and The Vanguard Group, Inc., for themselves and the Vanguard Group of Investment Companies (collectively, "Vanguard") regarding the use by Vanguard of the S & P 500 Stock Index ("S & P 500") in connection with the Vanguard Index Trust as described more fully in the attached Prospectus dated April 30, 1985, a draft of which is annexed hereto as Exhibit "A" and incorporated by reference herein.

In consideration for an annual license fee of Five Thousand Dollars ($5,000), payable to S & P by Vanguard on or prior to the effective date of this Agreement and on each anniversary date thereafter, S & P hereby grants Vanguard a non-exclusive, non-transferable right to use the S & P 500 and the data included in the S & P 500, together with related current or historical values, and S & P's trademarks and trade names solely in connection with the operation and management of the Vanguard Index Trust, as described in Exhibit "A" attached hereto, and the distribution, promotion and sale of shares of Vanguard Index Trust. S & P shall not have the right to terminate this license unless Vanguard fails to make any renewal license payment within 120 days after S & P has notified Vanguard by certified mail, return receipt requested, that such payment is overdue. Vanguard will not make any material changes in the manner in which Vanguard operates with respect to the Vanguard Index Trust without the approval of S & P.

All advertising, sales, promotional or demonstration materials which refer to any of the S & P trade names or trademarks, including without limitation, "Standard & Poor's", "S & P", "S & P 500", or "500", or which display data from the S & P 500 shall expressly state that "Standard & Poor's", "S & P", "S & P 500" and "500" are trademarks of S & P. Vanguard agrees not to use, publish or distribute the S & P 500 or the data contained therein, or refer to the S & P trade names or trademarks in any manner or form materially different from that provided herein which is not satisfactory to S & P. Vanguard will provide copies to S & P of any material changes in the aforesaid written material. S & P shall notify Vanguard if S & P deems any such revised material unsatisfactory.

The attached Prospectus of Vanguard Index Trust, beneath the heading "Investment Objective," describes the Index Trust as an open-end investment company designed as a first-of-its-kind index fund. The Prospectus states:

Vanguard Index Trust (the "Trust") is an open-end investment company designed as an "index fund," and is the first of its kind to be offered to the public. The Trust's investment objective is to provide investment results that correspond to the price and yield performance of publicly-traded common stocks in the aggregate, as represented by the Standard & Poor's 500 Composite Stock Price Index (the "Index").

The Prospectus then describes in detail the nature, performance, and operations of the Index Trust as a conventional open-end mutual fund. Thus, shares are to be bought and sold to or from the issuer, Vanguard, at prices determined by the net asset value, calculated as of the close of trading on the previous business day.

The second contract at issue, effective "as of January 1, 1988," is a fifteen-page document in a more traditional contract

form, titled "License Agreement" and executed by the same parties: Standard & Poor's, Vanguard Index Trust and Vanguard Group. The contract contains four clauses of preamble followed by twelve operative clauses ("Articles"). The third preamble clause recites Vanguard's continuing use of McGraw–Hill's trademarks and data under the 1985 license agreement, and incorporates and attaches the 1985 agreement.

> WHEREAS, Licensee has been using the S & P 500 for some time in connection with the operation and management of the Vanguard Index Fund, which parallels the composition of the S & P 500, and has been using S & P Marks for disclosure under federal and state securities laws to indicate that S & P is the source of the S & P 500, since 1985 pursuant to a License Agreement dated April 24, 1985 with S & P, a copy of which is attached hereto as Exhibit "A" and incorporated herein. .

The fourth preamble clause purports to explain the reason for the 1988 contract:

> WHEREAS, Licensee now wishes to use the "500" Mark as a title of one series or "Portfolio" of the Vanguard Index Trust, and otherwise to continue to use the S & P 500 and the S & P Marks as described above, and the parties have agreed upon this revision of their earlier License Agreement.

Article 1, the first operative clause of the contract, grants a license to Vanguard to use the S & P name and marks in naming, marketing and promoting the Vanguard funds.

> (a) Subject to the terms and conditions of this Agreement, S & P hereby grants to Licensee a nontransferable, non-exclusive license: (i) to use and refer to the "500" in the name of the Vanguard Index Trust's "500 Portfolio" (the "Fund"); and (ii) to use and refer to the S & P 500 and S & P Marks in the United States in registration statements and prospectuses in connection with the marketing and promotion of the Fund and to make such disclosure and use of . such documents as Licensee deems necessary or desirable under federal and state securities laws, and in other offering and promotional material in connection with the Fund in order to indicate the source of the S & P 500, provided all such uses are approved in advance by S & P for purposes of ensuring Licensee's compliance with this Agreement, which approval shall not be unreasonably withheld by S & P.

> . . . . .

> (e) Except as otherwise specifically provided herein, this Agreement shall not transfer to Licensee any right to, or interest in, the S & P Marks or S & P 500, or in any copyright, trademark or proprietary rights pertaining thereto.

The license grant language does not specifically include reference to the S & P index data underlying the S & P trademarks. Vanguard's continuing use of the data in the Index Trust is recited in the preamble and referred to in other operative clauses: Article 9 (Proprietary Rights), describing McGraw–Hill's efforts in developing the data; Article 10 (Warranties; Disclaimers), disclaiming liability for accuracy and completeness of the data; etc.

Other Articles address the contract term, license fees, conditions for termination of the contract, rights upon termination, obligations of the parties to act in good faith and protect the value of the license, and the like. The agreement also contains an integration clause. Article 12 provides that the 1988 agreement is the "entire agreement ... with respect to its subject matter" and "supersedes" all prior agreements including the 1985 letter agreement. Article 12 reads:

This Agreement constitutes the entire agreement of the parties hereto with respect to its subject matter and may be amended or modified only by a writing signed by duly authorized officers of both parties. This Agreement supersedes all previous agreements between the parties with respect to the subject matter of this Agreement, including without limitation, a letter agreement dated April 24, 1985 (a copy of which is attached hereto as Exhibit "A"). There are no oral or written collateral representations, agreements or understandings except as provided herein.

After the 1988 agreement, the parties made at least six amendments and additional agreements authorizing Vanguard to use the S & P trademarks and index data in connection with at least seven other Vanguard mutual funds. Thus, a letter agreement dated July 26, 1990 granted Vanguard Institutional Index Fund "the same rights accorded to Vanguard Index Trust;" a letter agreement executed March 25, 1991 does the same for the Vanguard Variable Insurance Fund; an amendment made as of August 25, 1992 extends the 1988 agreement to the S & P/BARRA Value Index and the S & P/BARRA Growth Index; and a letter agreement dated July 20, 1994 grants the Vanguard Tax Managed Fund "the same rights accorded to the Vanguard Index Trust and the Vanguard Variable Insurance Fund under Section I of the License Agreement,

as heretofore constituted." Two agreements in 1998 granted Vanguard licenses to use certain S & P indices and trademarks for three additional funds: the Vanguard Small Capitalization Growth Stock Portfolio, the Vanguard Small Capitalization Value Stock Portfolio and the Vanguard Mid Capitalization Stock Portfolio.[4]

There is no license agreement between the parties specific to VIPERs, for McGraw–Hill has been unwilling to license Vanguard to use its index data and trademarks in connection with VIPERs. At oral argument, McGraw–Hill represented that it cannot do so because of its other license agreements. The issue in this case is whether McGraw–Hill's pre-existing license agreements nevertheless permit Vanguard to use the S & P data and trademarks in connection with VIPERs.

### III. *Analysis*

My analysis of the trademark and associated intellectual property rights requires me to interpret the contracts that the parties executed in 1985 and 1988 to define their relationship. Since the 1988 contract purports to be the parties' "entire agreement", and "supersedes" the 1985 contract as to the "subject matter" of the 1988 agreement, I begin my analysis with the 1988 agreement.

Article I of the 1988 contract, the granting clause, defines the license being granted by McGraw–Hill. By that clause,

---

4. The amendments adopt by reference the grant language and other clauses of the 1988 license agreement. The granting language of the 1998 agreements, covering the S & P SmallCap 600 Composite Stock Price Index, the S & P SmallCap 600/BARRA Growth Index, the S & P SmallCap 600/BARRA Value Index, the S & P MidCap 400 Composite Stock Price Index, the S & P MidCap 400/BARRA Growth Index, and the S & P MidCap 400/BARRA Value Index, reads:

 Subject to the terms and conditions of this Agreement, S & P hereby grants to Licensee

a non-transferable, non-exclusive license (i) to use the S & P Indices as components of the Product to be marketed and/or promoted by Licensee and (ii) to use and refer to the S & P Marks in connection with the distribution, marketing and promotion of the Product (including in the name of the Product) and in connection with making such disclosure about the Product as Licensee deems necessary or desirable under any applicable law, rules, regulations or provision of this Agreement. . . .

McGraw–Hill grants a license to Vanguard "to use and refer" to the S & P 500 and other marks in the name of the Fund and in "marketing and promotion" of the Fund in order to "indicate the source of the S & P 500." All uses have to be "approved in advance" by McGraw–Hill to ensure "compliance with [the 1988] agreement," and approvals are not to be unreasonably withheld.

■ Unlike the 1985 agreement, the 1988 agreement's license provisions do not grant rights specifically to the S & P index data. It is clear, however, that the grant of trademark rights in the 1988 agreement was in connection with use of the S & P 500 Index, as Vanguard had theretofore been marketing and selling the S & P 500 Index through the Vanguard Index Trust. Trademarks symbolize, and cannot be assigned separately from, the goodwill they represent, for "[a] trade name or mark is merely a symbol of goodwill; it has no independent significance apart from the goodwill it symbolizes." *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir.1984). Trademark rights "exist only in connection with a business or a product and can be transferred only along with that product or business or its goodwill." *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 578 F.Supp. 911, 922 (S.D.N.Y.1983), *aff'd*, 746 F.2d 112 (1984). In the case before me, McGraw–Hill licensed its trademarks, that is, it gave a limited permit to Vanguard to use the marks. The limited permit gave Vanguard a "supervised" right to use the McGraw–Hill trademark in connection with a specific product. *See Universal City Studios*, 578 F.Supp. at 922 (trademark rights in character name King Kong may be transferred either by a supervised license or in connection with an ongoing business). McGraw–Hill licensed trademark rights to Vanguard for a particular use and pursuant to a contract that provides McGraw–Hill with the requisite degree of control to protect its goodwill.

■ In order to ascertain the intent of the parties, I look to their entire agreement, for "[i]t is a cardinal rule of contract interpretation that a court must construe the terms of an agreement as a whole and in a manner that gives effect to the mutual intent of the parties." *Aramony v. United Way of America*, No. 96 Civ. 3962, 1997 WL 732447, at *5 (S.D.N.Y. Nov. 24, 1997) (*citing* Restatement of Contracts (Second) § 202 (1981)). *See also Brooke Group Ltd. v. JCH Syndicate 488*, 87 N.Y.2d 530, 533, 640 N.Y.S.2d 479, 663 N.E.2d 635 (1996) ("[W]hen interpreting a contract, the entire contract must be considered so as to give each part meaning."); *Williams Press, Inc. v. State*, 37 N.Y.2d 434, 440, 373 N.Y.S.2d 72, 335 N.E.2d 299 (1975) ("[T]he construction of any contract must give due consideration to: (a) the entire contract; and (b) the disclosed intent of the parties."). This is as much the case with trademark licensing agreements as with any other agreement. *See, e.g., Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 100 (2d Cir.1997); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 18:43 (4th ed. 2000) ("Trademark license contract disputes are governed by the general rules of contract interpretation.").

The preamble clauses of the 1988 agreement describe the use which the parties intended for the S & P 500 data and trademark rights that had been licensed. That use was as per their pre-existing relationship, defined in the 1985 agreement and incorporated into the 1988 agreement. Thus, the third preamble clause of the 1988 agreement not only refers to the "License Agreement dated April 24, 1985," but incorporates and attaches it as well. The fourth preamble clause provides that Vanguard proposes to continue using the S & P data and trademarks as previously used, with the added use of the "500" name. It is that contin-

ued intended use by Vanguard that defines how the S & P 500 index data and trademarks may be used. That intended use was extended to additional Vanguard funds through the ensuing six amendments and additional agreements licensing use of additional S & P indices. The parties, in considering that they needed a new agreement for each new marketing activity, showed their understanding as to the scope of the 1988 license agreement, limiting the license to Vanguard's then-existing and continuing use. Thus, the parties would need a new agreement, and not an interpretive enlargement of an existing agreement, in order to encompass VI-PERs.

The 1985 contract had granted Vanguard "a non-exclusive, non-transferable right to use the S & P 500 and the data included in the S & P 500 ... and S & P's trademarks and trade names solely in connection with the operation and management of the Vanguard Index Trust, as described in Exhibit 'A' [the 1985 Prospectus] attached hereto, and the distribution, promotion and sale of shares of Vanguard Index Trust." That is the continuing use extending into and beyond the 1988 agreement. That is the use to which Vanguard's trademark and data license is limited. Thus, the 1988 agreement provides that it is the "entire agreement ... with respect to its subject matter," and that it "supersedes" as to its "subject matter" all prior agreements, including the 1985 agreement. But the 1988 agreement also "incorporate[s]" the 1985 agreement, and depends on it to define the use to which the S & P data and trademarks are to be limited. As the cases cited above teach, I am to construe all parts of the agreement as a whole—that which is incorporated and that which is stated afresh.

 Where the meaning of a contract term may be discerned from the contract language, "courts are required to give ef-fect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." *United States Trust Co. of New York v. Jenner,* 168 F.3d 630, 632 (2d Cir.1999). However, the language of the 1988 agreement as to what is incorporated and what is superseded has sufficient ambiguity to allow me to look to parol evidence in an effort to clarify the ambiguity. *See, e.g., Olin Corp. v. Insurance Co. of North America,* 221 F.3d 307, 318 (2d Cir.2000); *Weiner v. Anesthesia Associates of Western Suffolk, P.C.,* 203 A.D.2d 455, 610 N.Y.S.2d 608, 609 (1994). Thus, the parties' post–1988 amendments and additional agreements clarify the ambiguity, suggesting, as previously noted, that the scope of the 1988 agreement was limited to Vanguard's then-existing and continuing use of the S & P intellectual property.

The parol evidence from the period prior to the 1985 contract emphasizes this interpretation of the license as limited to a particular, defined usage. In the early 1980s, prior to its license agreements with Vanguard, S & P had successfully sued Commodity Exchange, Inc. ("Comex") to enjoin Comex's unlicensed use of the S & P 500 index data and trademarks in connection with its futures contracts. *See Standard & Poor's Corp. v. Commodity Exchange, Inc.,* 538 F.Supp. 1063 (S.D.N.Y.1982), *aff'd,* 683 F.2d 704 (2d Cir. 1982). S & P's experience with the Comex litigation prompted it to survey its subscribers in order to determine the nature of each subscriber's use of its data and trademarks. S & P then sought to negotiate license agreements authorizing the uses described in response to its survey.

Vanguard was one of the subscribers surveyed by S & P during its licensing review. By a letter dated November 9, 1983, Vanguard described its use of the S & P intellectual property:

We use the S & P 500 Index as a proxy for the stock market in measuring the performance of our equity funds, and also in economic and other internal analysis.

Vanguard Index Trust is one of the Mutual Funds in our group. It is a market index Fund based upon your S & P 500 Index. Therefore, we do rely on Standard & Poor's for information concerning the member companies in the 500 Index.

Vanguard, in response to a further inquiry, sent a copy of the Vanguard Index Trust's May 2, 1983 Prospectus to McGraw–Hill. The Prospectus described an open-end mutual fund based on the S & P 500, aiming to provide investment results corresponding to the performance of the S & P 500.

S & P then proposed a license of the use "illustrated in the Vanguard Index Trust prospectus":

Our intention is to provide Vanguard with a non-exclusive right to use the Index in the manner illustrated in the Vanguard Index Trust prospectus dated May 2, 1983.

After negotiations, S & P proposed an agreement providing a license to use the S & P 500 stock index and trademarks "as Vanguard is presently using them," in return for an annual fee of $5,000.

Standard & Poor's shall provide Vanguard with a non-exclusive, non-transferable, automatically renewable license to use the S & P 500 Stock Index and, whenever necessary, to use Standard & Poor's trade names and trademarks as Vanguard is presently using them in connection with the Vanguard Index Trust.

Following additional discussions and exchanges of correspondence consistent with the above, Vanguard updated its prospectus attachment to that effective as of April 30, 1985. In a letter dated May 1, 1985, Vanguard made clear that there were to be "no changes" in the Index Trust's "modus operandi;" clearly, that was to be the "modus operandi" that was to be licensed. Vanguard's letter stated:

I have just received and enclose a copy of the Prospectus of the Vanguard Index Trust which was filed and became effective on April 30, 1985. I am advised that, while there may be some very minor changes from the enclosure, which is a proof, there will be no changes in that portion of the Prospectus which relates to the Vanguard Index Trust's modus operandi. The enclosure, therefore, would be an appropriate attachment to the Vanguard/Standard & Poor's letter agreement.

If the enclosure is satisfactory, I will await receipt of the final letter, ready for execution.

The license agreement was executed soon after Vanguard's May 1 letter and made effective as of April 24, 1985. The agreement granted Vanguard a right to use the S & P index data and S & P trademarks "solely in connection with the operation and management of the Vanguard Index Trust, as described in [the attached 1985 prospectus], and the distribution, promotion and sale of shares of Vanguard Index Trust."

The parties' correspondence prior to the 1985 agreement thus supports the proposition that the 1985 prospectus was considered an accurate and limiting description of Vanguard's license to use the S & P 500 data and trademarks. This same limitation of use was incorporated into the 1988 agreement by the third preamble clause. The absence of further negotiations about the relevance and purpose of the incorporation makes clear that the parties intended the same restrictions on use that animated their negotiation of the 1985 agreement, a conclusion that is supported by the parties' stated intention in the

fourth preamble clause that Vanguard's pre-existing use of the S & P data and trademarks would "continue." Thus, the grant clause of the 1988 agreement was written on the slate of a continuing use of the S & P data and trademarks to create and market shares of an open-end mutual fund in the manner conventional to such funds.

At the time of their contracts, neither McGraw–Hill nor Vanguard contemplated an application of the license to an exchange-traded class of shares. Exchange-traded mutual funds did not exist at the time of the agreements, neither in 1985 nor in 1988. Indeed, apparently even today, exchange-traded classes of shares in open-end mutual funds apparently still do not exist. Thus, McGraw–Hill's expert, Arthur S. Loring, testified that, to the best of his knowledge, "[n]o open-end mutual fund company has offered or today offers an exchange-traded class of securities." Vanguard does not deny this. In 1985 and 1988, it was rare for a company to issue multiple classes of shares within a single mutual fund, and even when a company did so, the multiple classes were all open-end shares. It was not until 1995 that the SEC published the "Multiclass Rule," allowing mutual funds to issue multiple classes of shares without first obtaining an exemptive order, and that rule encompassed only open-end classes of shares, not exchange-traded classes of shares. Nothing in the parol evidence suggests that the parties contemplated that the license to Vanguard would encompass a financial instrument that did not exist at the time of the contracts and, even today, cannot lawfully be issued without a specific regulatory exemption and appropriate conditions distinguishing such security from conventional open-end mutual fund shares.

Nor does the license include a "zone of expansion" that could bring a new product like VIPERs within the ambit of the license. The "zone of expansion" theory, recognized by some courts in the realm of trademark law, holds that "a trademark owner should be given rights in its trademark, not only for the goods that it actually sells, but for all product markets into which it might reasonably be expected to expand in the future." *McCarthy on Trademarks, supra* at 24:17 (4th ed.2000). However, this theory, much-criticized even in the trademark context, *see id.* at 24:17, 26:22 & 26:23, should not be applied to this case. First, the zone of expansion theory relates to the rights of the trademark owner. Vanguard is merely a licensee of the trademarks, not their owner. If any party is to be afforded a reasonable zone of expansion of its rights, that party would be McGraw–Hill. Second, the zone of expansion theory is a creature of trademark law, not contract law. While this case involves claims of trademark infringement, it arises primarily as a contract dispute. The parties' trademark rights are determined by the interpretation and application of the parties' contracts. There appears to be no case in the New York state or federal courts applying the theory of a zone of expansion of a product market in the context of a contractual license. Moreover, courts are admonished to interpret contracts, not to rewrite them.[5] Since nothing in the contracts themselves or in the parol evidence suggests that the parties intend-

---

**5.** *See, e.g., Emcee Personnel v. Morgan Lewis & Bockius, LLP,* 702 N.Y.S.2d 633, 269 A.D.2d 353 (2000) ("A court may not, in the guise of interpreting a contract, add or excise terms or distort the meaning of those used to make a new contract for the parties.") (*citing Morlee Sales Corp. v. Manufacturers Trust Co.,* 9 N.Y.2d 16, 19, 210 N.Y.S.2d 516, 172 N.E.2d 280 (1961)). *See also Wastemasters, Inc. v. Diversified Investors Services of North America, Inc.,* 159 F.3d 76, 79 (2d Cir.1998) ("[C]ourts should not rewrite the contracts before them to conform to their own conception of business equity.").

ed that the license include a "zone of expansion," I decline to add a "zone of expansion" to the license terms chosen by the contracting parties.

Vanguard's proposed issuance of VIPERs would create a new financial instrument that would be bought and sold on securities exchanges, at prices determined by the market during the trading day, just as if they were shares issued by a closed-end investment fund. VIPERs could trade at prices above or below the previously determined net asset value of the fund, and could be bought on margin, sold short, or sold with limit orders. They are intended to accommodate large-block, short-swing traders, not the typical owners of conventional, open-end mutual funds. They would require a new and specialized operation and management, overseeing, among other things, issuances and redemptions of creation units and alignment with the normal operations of the fund. The issuance of VIPERs by Vanguard would enlarge the 1988 contract beyond the terms and scope of the McGraw–Hill license, thereby breaching the contract and infringing McGraw–Hill's trademark rights.

## IV. *Relief Granted*

McGraw–Hill asks that Vanguard be enjoined from using the S & P indices and the S & P trademarks in connection with VIPERs or any other exchange-traded class of shares within the Vanguard 500 Index Fund or the other funds covered by the amendments to the 1988 agreement. McGraw–Hill also requests a declaration that the parties' rights under the 1988 agreement not include rights to use the S & P 500 data, trademarks and trade names in connection with such exchange-traded securities; actual and treble damages, costs, and reasonable attorneys' fees and expenses; and related other relief.

A declaration of the parties' rights and an injunction against unauthorized use is sufficient relief. Because the VIPERs have not yet been issued, McGraw–Hill has not been damaged. Lastly, McGraw–Hill has shown no basis for shifting of attorneys' fees.[6]

## V. *Conclusion*

For the reasons stated, I grant the motion of Plaintiff McGraw–Hill, and deny the motion of Defendant Vanguard. Plaintiff McGraw–Hill is entitled to the relief stated above. The parties shall submit an order and judgment conforming to this decision by 12:00 noon on May 2, 2001. The order shall direct the Clerk of the Court to close the case, but may provide for my continuing jurisdiction to enforce the decree.

SO ORDERED.

---

**6.** Under New York law, "[g]enerally, attorney's fees are not recoverable as damages in an action for breach of contract ... unless expressly agreed to by the parties." *Equitable Lumber Corp. v. IPA Land Development Corp.,* 38 N.Y.2d 516, 519, 381 N.Y.S.2d 459, 462, 344 N.E.2d 391 (1976). *See also Allied Leather Corp. v. Interco Inc.,* No. 88 Civ. 1394, 1993 WL 159970 at *8 (S.D.N.Y. May 10, 1993). Nothing in either the 1985 agreement or the 1988 agreement provides for fee-shifting. Furthermore, in trademark disputes under the Lanham Act, courts shall award at-torney's fees to the prevailing party only in "exceptional cases." 15 U.S.C. § 1117(a) (West 2001). Such cases generally involve "intentional, deliberate or willful infringement." *McCarthy on Trademarks, supra* at § 30:100. This case involves divergent interpretations of an ambiguous license agreement, not willful infringement of a plaintiff's trademarks. McGraw–Hill's other claims are sufficiently intertwined with the breach of contract and trademark infringement claims that an award of attorneys' fees on those claims also would be inappropriate.